[No. A123469. First Dist., Div. Two. June 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM CHARLES JOHNSON, Defendant and Appellant.

## COUNSEL

Hilda Ellen Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHMAN, J.**—Defendant William Charles Johnson appeals from his conviction of attempted murder of his girlfriend and related charges and enhancements that resulted in a sentence of 60 years to life. The issues on appeal concern the trial court's admission of evidence of two prior incidents involving domestic violence under Evidence Code sections 1101 and 1109,[1] as well as a jury instruction relating to that evidence. We find no error in the evidentiary rulings and find the instructional error harmless.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant, whose nickname was "Mookie," and the victim, Nicole Henderson, had grown up in the same neighborhood in Oakland and had been friends since Henderson's teenage years in the late 1980's. By 2004, they had become romantically involved, and defendant had moved in with Henderson and her two sons about two years before the events in question. The relationship was deteriorating by late 2006 because Henderson could no longer tolerate defendant's drug abuse and his threats against her. She told him that if he could not get off drugs she would leave him. He said if she left, "somebody was going to die." Somebody almost did.

While Henderson was driving defendant to work on December 28, 2006, defendant threatened to shoot her, saying, "I should blow your mother fuckin' head off." He stretched out his left arm and pointed it at her, and she thought he might have a gun. That night Henderson left the house with her son and went to her mother's house to stay, fearing what defendant might do. She knew he had injured a former girlfriend named Amanda, and she had seen

---

[1] All statutory references, unless otherwise indicated, are to the Evidence Code.

him with guns before. The next day Henderson went to court and applied for a restraining order, but one was not issued immediately because of the holidays.

Defendant called Henderson's cell phone several times over the next few days, but she did not answer. She did, however, record the calls, which were played for the jury. Defendant left a message for Henderson on January 1, saying that if she did not apologize to him, he would come to her workplace, would "check [her] ass there," and would "put one in [her]."

After receiving that threat, Henderson returned home, changed the locks on the door, and then spent the night at her cousin's house in Richmond. While she was at her house, Henderson noticed that some of defendant's possessions had been moved out, but some were packed up and still sitting in the living room.

Defendant called Henderson early the next morning and told her he wanted to get the rest of his things out of her house, and that he needed some papers he had left there so he could get into a drug treatment program. She told him she would bring the papers to the childcare center where she worked, and he could pick them up there when she arrived at work at 9:00 a.m.

Defendant did not show up until a little after 5:00 p.m., having called to say he was on his way. Henderson went outside and saw him arrive alone in an unfamiliar car.

Defendant parked his car at an odd angle in the daycare parking lot, blocking Henderson's car from exiting. Henderson immediately retrieved the documents from her car and gave them to defendant. People were coming and going through the parking lot as parents picked up their children from the childcare center.

Defendant then asked for the return of some of his fishing gear from Henderson's car and began carrying his possessions from the trunk of her car to the trunk of his car. When he spent time rooting around in Henderson's trunk, trying to find a fishing knife that she told him was not there, Henderson got the feeling defendant was "stalling." Throughout this time, he kept repeating, with increasing anger, "So this is how you want it, huh?" Henderson assured him she was serious about breaking up with him.

Defendant "kept looking around" during this time, inferably waiting for the parking lot to empty. He was wide-eyed and appeared agitated. By the time he finished rummaging through Henderson's trunk, he and Henderson were the only ones left in the parking lot. Finally, defendant returned to the trunk

of his car (about 10 feet behind where Henderson was standing). Henderson thought he was preparing to leave, and she turned her back to defendant to close the trunk of her own car.

Just then she heard a loud noise that deafened her temporarily. She then heard two or three more shots in rapid succession.[2] She felt the back of her neck get warm, but did not realize she had been shot until she hit the ground, forehead first. She never saw a gun in defendant's hand, but she knew he owned two guns. Henderson and every other percipient witness testified there was no one else in the car defendant was driving, no one else in the parking lot, and no one else in close proximity at the time of the shooting. Henderson testified she had no other enemies.

After Henderson collapsed, defendant returned to his car, closed the trunk, and drove off. Another witness said he "sped off," "burning rubber." While Henderson lay in the parking lot, she told both a coworker and the responding police officer that her boyfriend "Mookie" had shot her, and she named him at trial as the shooter.

Two shots hit Henderson, one in her arm, and one in her back. The shot to her arm left a 10-inch scar and required surgery in which nerves from her leg were removed and transferred into her arm. Though she had previously been left-handed, that arm was badly mangled after the shooting, forcing her to switch hands to write. She had been in physical therapy ever since, but had not recovered full sensitivity or use of her left arm at the time of trial.

The shot to her back was just inches to the right of her spine, and the doctors initially told her she might be paralyzed from the neck down. Fortunately she was not. The bullet fractured two of the wings of her vertebrae on the left side and one of her left ribs, bruised her left lung, and lodged near her left collarbone. It was surgically removed some three weeks later.

Two witnesses—Tara Simpson, who was picking up her son at the daycare center, and her friend, Bonnie Durr, who had driven her there—confirmed that defendant was the man they saw in the parking lot with Henderson just before she was shot. They testified there was no one else in the immediate vicinity. No one, however, saw defendant with a gun.

---

[2] Two witnesses testified they heard five gunshots; others remembered only three.

The defense appeared to be one of mistaken identity. Defense counsel emphasized that neither Simpson nor Durr had confidently identified defendant in photographic lineups.[3] Members of defendant's legal team were called as witnesses, evidently to cast doubt on Simpson's and Durr's identification testimonies.[4] Defense counsel claimed Simpson and Durr were "mistaken in their identification" and were unwittingly biased.[5]

Defense counsel stressed that no one saw defendant with a gun, there was no heated argument in the parking lot, and defendant made no threats just prior to the shooting. He asked the jury to acquit defendant based on a theory that the trajectory of the bullet through Henderson's back excluded him as the shooter. Since the bullet entered Henderson's back on the right side of the spine, but did its internal damage and ultimately lodged on the left side, defense counsel argued that the shooter must have been to Henderson's right when the shots were fired. He could not have been standing where Henderson last saw defendant, which was behind Henderson and to her left. But counsel put forth no theory whatsoever about who the "real" shooter might have been.[6]

A police witness testified that a bullet hole in the door jamb of the childcare center showed a trajectory consistent with having been fired from the vicinity of Henderson's trunk. The prosecutor also pointed out to the jury that defendant could have moved without Henderson's realizing it, since she had her back to him, or Henderson's own body may have changed position, perhaps by force of the first bullet, which could explain the trajectory of the

---

[3] Durr testified that two of the photos looked familiar, and she did not want to accuse the wrong person, so she told the police it was none of them. But when she saw defendant at the preliminary examination she was "certain beyond doubt" he was the man she had seen in the parking lot. Simpson chose two photos as possible suspects, including one of defendant. She also recognized him at the preliminary examination.

[4] The lawyer who had represented defendant at the preliminary examination testified that although he had subpoenaed Simpson and Durr, neither had ever told him they recognized defendant when they saw him in court, even though he had since seen both women on several occasions. Defense counsel insinuated that if these witnesses really had recognized defendant at the preliminary examination, they should have told defense counsel about that "mental" identification.

[5] This bias supposedly arose from the fact that Simpson and Durr were friends, and Henderson was Simpson's son's teacher at the childcare center. A defense investigator testified that Simpson knew for sure Henderson was her son's teacher at a pretrial interview, whereas she testified at trial she was not sure.

[6] Prior to trial, defense counsel sought a continuance to investigate a third party culpability theory regarding Charles Dunn, who worked with defendant. Dunn made one telephone call to Henderson, indicating he and defendant would pick up defendant's things from Henderson's house on December 30. Dunn told police he was not present at the time of the shooting and knew nothing about it. Defense counsel offered no evidence to the contrary, and the continuance was denied.

bullet through her back. He emphasized the prior threats and the uncontradicted testimony by multiple witnesses that no one else was near Henderson at the time of the shooting.

On June 3, 2008, the jury returned guilty verdicts on all charged offenses: attempted first degree murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)), firearm assault (Pen. Code, § 245, subd. (a)(2)), injury to a cohabitant (Pen. Code, § 273.5, subd. (a)), felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)), criminal threats (Pen. Code, § 422), and mayhem (Pen. Code, § 203). It also returned true findings on various firearm and great bodily injury enhancements. After defendant waived jury trial on the prior conviction allegations, the court found true two prior serious felony convictions. (Pen. Code, § 667.) Four remaining prison term priors (Pen. Code, § 667.5) were stricken at the People's request. On December 5, 2008, defendant was sentenced to 60 years to life in prison. This timely appeal followed.

## DISCUSSION

### I. *Section 1109 Is Constitutional on Its Face.*

The prosecutor moved in limine to present testimony relating to three prior incidents of domestic violence by defendant under sections 1101 and 1109. The court ruled that two of the incidents were admissible under section 1109 and found admission of the evidence was "in the interest of justice." Both incidents involved defendant's having shot a former girlfriend when she tried to break up with him or got into an argument with him. The third incident did not involve the use of a weapon and was ruled inadmissible. The details of the prior incidents will be described below.

Section 1109, subdivision (a)(1), provides as follows: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Defendant claims that section, on its face, violates the due process clause because it allows introduction of propensity evidence in violation of the historical Anglo-American prohibition of such evidence.

■ Domestic violence is but one of the areas in which the rules of evidence have been relaxed in recent years. Section 1109, subdivision (a)(2) and (3) allows admission of prior incidents of elder abuse and child abuse when the defendant is currently charged with a like offense, and section 1108

provides a similar evidentiary exception for past commission of sexual offenses when the defendant is being tried for a sexual offense.

These statutes are remarkable not because they allow testimony about prior misconduct, but because they allow the jury to draw propensity inferences from the prior acts. (Compare § 1101 with §§ 1108, 1109.) Thus, defendant's jury was instructed that if it found by a preponderance of the evidence that defendant committed a prior offense involving domestic violence, it could "infer that the defendant had a disposition to commit other offenses involving domestic violence" and further infer "that he was likely to commit and did commit the crimes of which he is accused." (See also CALCRIM Nos. 852, 853, 1191; CALJIC Nos. 2.50.01, 2.50.02, 2.50.03.)

Notably, however, each of these sections and subdivisions ends with the same conditional language, namely, that such evidence is admissible only "if the evidence is not inadmissible pursuant to Section 352." (§§ 1108, subd. (a), 1109, subd. (a)(1), (2) & (3).) Thus, there is an overriding safety valve built into each statute that continues to prohibit admission of such evidence whenever its prejudicial impact substantially outweighs its probative value. (§ 352.) It was precisely the incorporation of this safeguard that led the Supreme Court in *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*) to uphold the constitutionality of section 1108 against an attack similar to the one raised here.

Defendant notes, of course, that the Supreme Court has not specifically ruled on the constitutionality of section 1109. The Courts of Appeal, however, including our own division (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1328–1329, 1334 [92 Cal.Rptr.2d 433] (*Brown*)), have uniformly followed the reasoning of *Falsetta* in holding section 1109 does not offend due process. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 703–704 [61 Cal.Rptr.3d 373]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [15 Cal.Rptr.3d 229]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095–1096 [98 Cal.Rptr.2d 696]; *People v. James* (2000) 81 Cal.App.4th 1343, 1353 [96 Cal.Rptr.2d 823]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309–1310 [97 Cal.Rptr.2d 727]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027–1028 [92 Cal.Rptr.2d 20] (*Hoover*); *People v. Johnson* (2000) 77 Cal.App.4th 410, 417–420 [91 Cal.Rptr.2d 596] (*Johnson*).) We therefore reject defendant's facial attack as having already been settled unfavorably to him.

II. *The Remoteness of the Prior Acts of Domestic Violence Did Not Render Application of Section 1109 Unconstitutional, and the Court Did Not Abuse Its Discretion in Admitting That Evidence.*

Defendant also claims section 1109, subdivision (e) was unconstitutional as applied to him because the two incidents admitted in evidence were more than 10 years in the past, one having occurred in 1988 and the other in 1992. Defendant claims admission of the evidence deprived him of due process, and in any event was an abuse of discretion.

A. *Factual background and trial court's ruling*

Prior to trial, the prosecutor sought permission to introduce testimony concerning three prior incidents of domestic violence in which defendant had been involved. The first was in 1984 and involved Lynne Webb, who was defendant's girlfriend at the time, and also the mother of his two children. In that incident, defendant punched Webb in the jaw twice during an argument, fracturing it in two places. The court ruled this incident inadmissible because it did not involve a weapon.

In 1988, defendant had been romantically involved with Amanda Floyd for about a year. However, when she caught him coming out of a drug house under the influence, Floyd told him the relationship was over and he should move his things out of her house. A week or two later, when he evidently had not complied, she took his belongings to his mother's house. There, she and defendant argued. Defendant pulled out a small black snub-nose handgun, pointed it at Floyd, and said he was going to kill her. Floyd screamed, and defendant's father and brother came into the room and talked him into giving up the gun.

Floyd moved to a different apartment, but defendant tracked her down. About two weeks later, Floyd came home from doing her laundry and found defendant inside her home. He said he came to try to get back together with her. After they argued for several hours, defendant threatened to burn down Floyd's apartment and kill her. He then lit some paper towels and Floyd's nightgown on fire and slid them under the door to the bathroom, where Floyd's six- or seven-year-old daughter was taking a bath.

Defendant then pulled the snub-nose gun from his back pocket, and set the gun, a crack pipe, and a bottle of Hennessy on an ironing board. He pointed the gun at Floyd and insisted that she watch him freebase and drink Hennessy. He then smoked crack and drank Hennessy for about 20 minutes, until he started to doze off.

Floyd then made a run for the door. Just as she got one foot outside the door, defendant grabbed her by the hair and said, "Bitch, I'm going to kill

you." He put the gun up to Floyd's forehead and pulled the trigger, but the gun did not fire. He pulled the trigger two more times as Floyd backed away from him, but the gun still did not fire. Floyd tripped over a chair and fell to the ground, covering her face with her arms.

The fourth time defendant pulled the trigger, the gun fired, hitting Floyd in the arm near her left elbow. Her arm was broken, and the bullet was still lodged in her arm at the time of trial. Defense counsel attempted to impeach Floyd with the fact that she did not report all of the details of the assaults to the police or at the preliminary examination in her case.

By 1992, defendant was again intimately involved with Lynne Webb. Both she and defendant were using drugs at the time. She was arguing with defendant in front of his mother's house when he pulled out a gun. She saw the gun and ducked. Webb heard two shots. She looked down and saw she had been hit in the leg by a bullet. At trial she called the shooting a "mistake." Her femur was broken, and although it eventually healed, it necessitated a hip replacement. Webb admitted she had three prior convictions for drug sales and assault.

The court ruled that the 1988 and 1992 shootings were admissible, finding admission warranted "in the interest of justice." (§ 1109, subd. (e).) It found evidence of those incidents "more probative than prejudicial" and concluded it would "assist the trier of fact in determining elements and issues that will be relevant in this case."

> B. *The court did not abuse its discretion in determining the evidence was not substantially more prejudicial than probative under section 352 and section 1109, subdivision (a)*

By its incorporation of section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is "substantially outweighed" by its prejudicial impact.[7] We review a challenge to a trial court's decision to admit such evidence for abuse of discretion. (*People v. Branch* (2001) 91 Cal.App.4th 274, 281–282 [109 Cal.Rptr.2d 870] (*Branch*); see also *Brown, supra,* 77 Cal.App.4th at p. 1337.)

" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180

---

[7] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Cal.App.4th 1262, 1274 [103 Cal.Rptr.3d 633].) Section 1109 was intended to make admissible a prior incident "similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, p. 5 (Assembly Analysis of Senate Bill 1876).) Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation. (See *People v. Britt* (2002) 104 Cal.App.4th 500, 505–506 [128 Cal.Rptr.2d 290] [§ 1108].) Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the "typically repetitive nature" of domestic violence.[8] (Assem. Analysis of Sen. Bill 1876, *supra*, at pp. 6–7; see also *Brown, supra*, 77 Cal.App.4th at p. 1333.) This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.[9] (See *Hoover, supra*, 77 Cal.App.4th at p. 1027.)

In this case the probative value was great. In each of the prior cases defendant resorted to shooting his girlfriend when she either had decided to break up with him or was actively engaged in an argument with him. Defendant's drug use was a factor in each incident, either in precipitating the breakup, or because defendant was under the influence at the time of the assault, or both. In each case a serious injury was inflicted.

The 1988 prior was especially similar in that it also involved a breakup initiated by a girlfriend because of defendant's drug problem, and defendant threatened her before the shooting, as he did Henderson.[10] In both 1988 and 2007, defendant went out of his way to bring himself into the victim's

---

[8] "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked." (Assem. Analysis of Sen. Bill 1876, *supra*, at p. 3.)

[9] The legislative history of section 1108 suggests an underlying psychological abnormality that makes such evidence especially probative: "The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 882 (1995–1996 Reg. Sess.) as amended July 18, 1995, p. 8.) Another legislative analysis noted, " 'In child molestation actions a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant—a sexual or sado-sexual interest in children—that simply does not exist in ordinary people.' " (Sen. Com. on Crim. Proc., Analysis of Assem. Bill No. 882 (1995–1996 Reg. Sess.) as amended May 15, 1995, p. 6.)

[10] The prosecutor claimed threats were involved in both of the earlier cases, but there was ultimately no testimony by Webb about prior threats. She was reluctant to testify and was declared a hostile witness.

presence (either at her home or place of work) for the evident purpose of talking her into reconciling or else killing or maiming her if she refused. In both instances, he fired at close range at a vital body part (head or upper torso), and in both he used a small handgun capable of concealment until he was ready to use it.

The common factors in all three crimes strongly suggest defendant has a problem with anger management, specifically with regard to female intimate partners, and specifically when he feels rejected or challenged by such a partner. He has demonstrated a pattern of using guns to exact revenge. Whatever the psychological forces at work, the Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior.

Also weighing in favor of admissibility, the evidence of the prior assaults came from independent sources, which reduced the danger of fabrication. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) In addition, defendant was convicted of the prior offenses. Although the jury was not so informed, the fact that the prior misconduct had resulted in conviction—ultimately proved beyond a reasonable doubt to the court—reduced the likelihood that defendant could have produced evidence to rebut the witnesses' testimony. Therefore, the unfairness of forcing a defendant to mount a defense against evidence of a long-past incident was not a legitimate consideration in this case. (See *Falsetta, supra*, 21 Cal.4th at pp. 915–916.)

The court also properly found that the evidence would not unduly confuse the issues. The past acts of violence were separated by time and involved different victims and witnesses. And there was no deception or confusion engendered by the arguments of counsel.

Likewise, the court found presentation of the evidence would not consume inordinate time. This proved to be true, as Webb's testimony consumed only seven pages of the transcript, and Floyd's testimony only about 40 pages. (Cf. *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139 [83 Cal.Rptr.2d 320] [35 pages].)

On the prejudice side of the scale, the evidence of past misconduct was somewhat inflammatory, especially the details given by Floyd regarding defendant's mental torment of her before he shot her. Overall, however, the

trial court viewed the past conduct as less egregious and inflammatory than that involved in the present case.[11] We cannot fault that reasoning.

The current crime was a sneak attack in the parking lot of a daycare center where other people, including small children, might have been injured or traumatized by the shooting. Multiple shots were fired and two hit the victim. One was aimed directly at Henderson's upper midbody, near her spinal cord and vital organs. The shooting was preceded by threats and involved planning. It left its victim permanently maimed and partially disabled. The trial court did not abuse its discretion by finding the current offense "more heinous" than past incidents.

■ The fact that damning inferences may be drawn from defendant's treatment of Floyd does not make evidence of that shooting unduly prejudicial. The word "prejudicial" is not synonymous with "damaging." (*People v. Poplar, supra*, 70 Cal.App.4th at p. 1138.) Rather, evidence is unduly prejudicial under section 352 only if it " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues" ' " (*People v. Poplar*, at p. 1138), or if it invites the jury to prejudge " ' "a person or cause on the basis of extraneous factors" ' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 737 [70 Cal.Rptr.2d 689] (*Harris*)). "Painting a person faithfully is not, of itself, unfair." (*Ibid.*)

■ The real heart of defendant's argument is that the prior acts were too remote to be probative of his current disposition to engage in domestic violence. Remote prior conduct is, at least theoretically, less probative of propensity than more recent misconduct. (See *Branch, supra*, 91 Cal.App.4th at pp. 284–285.) This is especially true if the defendant has led a substantially blameless life in the interim (*Harris, supra*, 60 Cal.App.4th at p. 739), which was not true in this case.[12]

Defendant claims cases decided under section 1109 have not admitted evidence older than four years prior to the current offense. In *People v. Morton* (2008) 159 Cal.App.4th 239, 248 [70 Cal.Rptr.3d 827], however, the court upheld the admission of evidence of domestic violence that occurred "more than nine years prior" to the current charge. Similarly, *Johnson, supra*, 77

---

[11] Courts are primarily concerned where the past bad act was "more inflammatory" than the offense for which the defendant is on trial. (*Ewoldt, supra*, 7 Cal.4th at p. 405; see *People v. Jennings, supra*, 81 Cal.App.4th at p. 1315.)

[12] The court noted, "I'd be surprised if Mr. Johnson has led a blame-free life from 1992 to the present." The information alleged that defendant was convicted of drug and weapons offenses in 1993, 1999 and 2002. Defense counsel tacitly conceded these convictions had occurred. Because both drugs and weapons were involved in defendant's pattern of domestic violence, his overall criminal record does not support the argument that his prior acts of domestic violence had lost their probative value.

Cal.App.4th at pages 414–415, allowed evidence of prior domestic violence dating back approximately 10 years before the current offense.

■ Indeed, "[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*Branch, supra*, 91 Cal.App.4th at p. 284.) In *Ewoldt, supra*, 7 Cal.4th at page 405, the Supreme Court found the passage of 12 years since a prior incident of child molestation did not "significantly lessen the probative value of [the] evidence." Cases decided under section 1108 likewise do not support defendant's argument. They have held that acts remote in time are not automatically inadmissible, and even a prior act from 20 years earlier or more is not "too remote." (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [95 Cal.Rptr.2d 45] (*Waples*).)

Nevertheless, defendant relies on *Harris, supra*, 60 Cal.App.4th 727, where the court held a 23-year-old prior sex offense was too remote to be admissible under section 1108. (60 Cal.App.4th at p. 739.) Harris, a male mental health nurse, was on trial for taking sexual advantage of two mentally troubled, vulnerable women. Both incidents were nonviolent, and both victims remained "on speaking terms" with Harris afterwards. (*Id.* at pp. 731–732, 738.) The 23-year-old prior, on the other hand, had been a brutal rape of Harris's neighbor, in which he had stabbed the victim repeatedly with an ice pick and mutilated her vagina. (*Id.* at pp. 733–735.) Although a toned-down version was presented to the jurors, they did hear testimony describing the "viciously beaten and bloody victim," they were told that Harris was arrested nearby with blood on his clothes and penis, and they were informed that he was convicted of burglary, with serious bodily injury, in connection with that crime. (*Id.* at pp. 734–735, 738.) Harris, unlike defendant here (see fn. 12, *ante*), had led a largely "unblemished" life since the prior rape. (*Harris*, at p. 739.)

Consequently, we believe the graphic, violent nature of the evidence in *Harris, supra*, 60 Cal.App.4th 727, which was otherwise a close case,[13] led the court to declare the evidence inadmissible. Remoteness was a less significant factor. Here the prior events were more recent than in *Harris*, their impact less shocking, and the evidence of the current offense was stronger. Most importantly, though, this case involved greater similarities between the past incidents and the current one.

In assessing remote priors, the cases have examined the details of the past misconduct, comparing them to the details of the currently charged offense, to

---

[13] In one of the current offenses the victim suffered from hallucinations, and in the other there was an issue of consent or appearance of consent. (*Harris, supra*, 60 Cal.App.4th at p. 732.) The Court of Appeal concluded that defendant had "a strong defense" on both current counts. (*Id.* at p. 733.) The same certainly cannot be said here.

determine whether the similarities in the two incidents "balance out the remoteness" of the prior offense. (*Branch, supra,* 91 Cal.App.4th at p. 285.) In *Branch,* for instance, a 30-year-old sexual offense was deemed admissible in a current sex offense case because in each instance the defendant molested a 12-year-old girl who was staying at his home and in each case attempted to avoid detection by claiming the girl herself had done something wrong. (*Ibid.*)

Similarly, in *Waples, supra,* 79 Cal.App.4th at pages 1393–1395, a horse trainer was accused of insinuating himself into families with young girls seven to 10 years old, and using their mutual interest in horses to gain access to them for sexual purposes. Several minors told similar stories of being molested, but Waples's defense was that they were "[either] lying or mistaken" about the molestation. (*Id.* at p. 1394.) A 35-year-old woman was allowed to testify about prior molestation she had endured at Waples's hands when she was seven to 14 years old, describing conduct similar to that experienced by the young victims in his current trial. (*Id.* at pp. 1393–1394.) Though the prior misconduct had occurred 18 to 25 years prior to the current offense, it was not too remote to be admissible under section 1108 because the "similarities between the prior and current acts . . . balanced out the remoteness." (79 Cal.App.4th at p. 1395.) The same analysis applies here.

■ Finally, because Henderson appeared as a witness against him, defendant seizes upon one policy consideration underlying sections 1108 and 1109—the reluctance of victims to come forward and testify—to argue that the evidence of prior misconduct was more prejudicial than probative in this case.[14] (*Brown, supra,* 77 Cal.App.4th at p. 1333.) But we think the probative value of the evidence must be assessed independently of the current victim's willingness to testify, with the principal consideration being the similarity of the uncharged act to the charged offense. (*People v. Hollie, supra,* 180 Cal.App.4th at p. 1274.) Moreover, the prejudicial effect of the evidence is *diminished*—not increased—if the evidence of the current crime is strong, for it is less likely the jury will be swayed to convict the defendant based on his past misconduct. (See *Ewoldt, supra,* 7 Cal.4th at p. 405.)

[14] Section 1108 was enacted in part to address " 'difficulties of proof arising from the typically secretive nature of sexual offenses, and the difficulty of stopping rapists and child molesters because of the reluctance of many victims to report the crime or testify.' " (Sen. Com. on Crim. Proc., Analysis of Assem. Bill No. 882 (1995–1996 Reg. Sess.) as amended May 15, 1995, p. 6.) Section 1109, too, was enacted in part "because of the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved." (Assem. Analysis of Sen. Bill 1876, *supra,* at pp. 6–7.)

■ For the foregoing reasons, the trial court did not abuse its discretion in deciding the evidence was not substantially more prejudicial than probative under sections 352 and 1109, subdivision (a)(1).

### C. *The court properly determined that admission of the evidence was "in the interest of justice" under section 1109, subdivision (e).*

Defendant, however, argues that section 1109, subdivision (e), calls for a different result because it specifically restricts admissibility of remote prior domestic violence: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." Thus, while evidence of past domestic violence is presumptively admissible under subdivision (a)(1),[15] subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past. Defendant claims the trial court's finding that admissibility would further the "interest of justice" under subdivision (e) was flawed in both its method and its conclusion.

He distinguishes cases decided under section 1108, because that section contains no provision similar to section 1109, subdivision (e). Despite this difference, we conclude the court did not abuse its discretion in admitting the evidence of the 1988 and 1992 shootings "in the interest of justice" under subdivision (e).

### 1. *A proper inquiry was conducted.*

Preliminarily, defendant claims the court did not even conduct a section 352 analysis when ruling under section 1109, and instead applied that analysis only under section 1101, subdivision (b). He further contends the court showed no awareness of the presumption of inadmissibility under subdivision (e) of section 1109. These claims are belied by the record.

Defendant's briefing in the trial court included specific reference to the 10-year cutoff for the presumption of admissibility under subdivision (e). The prosecutor's office opened the hearing by acknowledging that, because the priors were more than 10 years old, the court could only admit them if it found doing so would be "in the interest of justice." The trial court asked specific questions about this requirement, including, "does the statute give us any direction on what they consider to be the interest of justice?" The People noted there was no statutory definition, and defense counsel urged the court to employ a section 352 analysis in deciding the issue.

---

[15] Citations to subdivisions without reference to a code section are to the subdivisions of Evidence Code section 1109.

The court then opined that defendant's two prior incidents with "gunshots fired" "look pretty similar," while acknowledging that the 1984 incident "where he broke her jaw" "may be dissimilar." The court then recited other similarities between the prior shootings and the shooting of Henderson, including that they all occurred during an argument with an intimate partner. The People argued that all three incidents showed that defendant "becomes angry when he's unable to exert power and control over his female partners."

The court did not rule immediately under section 1109, asking first for argument under section 1101. The court identified "a significant issue of intent" in both the substantive offenses alleged and the enhancements, and found evidence of the 1988 and 1992 priors relevant to intent, motive, and lack of mistake. Since defendant had been convicted of the prior acts, the court surmised it would not take long to present the testimony. It found the current offense "more heinous than the uncharged priors" and thus ruled the prior shootings were not unduly inflammatory. Rather, the court believed the evidence would help the jurors "understand the facts." It found there would be no confusion of issues or misleading of the jury.

While weighing remoteness as a factor, the court concluded that the 1988 and 1992 prior shootings were "so similar" that they were "more probative than prejudicial." The court therefore allowed evidence of the 1988 and 1992 prior shootings under section 1101, subdivision (b) on the issues of motive, state of mind or intent, and lack of mistake, but held it inadmissible to show a "common scheme" or "plan." The court also ruled "under section 1109(e)," that the same two prior incidents would be admissible "in the interest of justice" in that they would "assist the trier of fact . . . in determining elements and issues that will be relevant in this case." The 1984 assault using his fists was held inadmissible under both statutes due to "dissimilarities" in the means of attack and the injuries inflicted.

In light of this record, we cannot agree with defendant that the trial court misunderstood which rulings it was required to make or limited its balancing under section 352 to the section 1101 issue. On the contrary, the court conducted a thorough analysis of the factors on both sides of the scale, focusing primarily on the degree to which the prior incidents were similar or dissimilar to the current offense, and ruled in defendant's favor by excluding one of them. We find no procedural error.

> 2. *The trial court's "interest of justice" analysis was not an abuse of discretion.*

Still, defendant argues the court erred in admitting the prior shooting incidents because subdivision (e) requires an even "higher level of scrutiny"

than does section 352. The Attorney General takes the position that subdivision (e) adds little substantively to the analysis under section 352. We agree with defendant in principle that a more stringent standard of admissibility applies, but we side with the Attorney General regarding the adequacy of the inquiry in this case.

■ Subdivision (e) establishes a presumption that conduct more than 10 years prior to the current offense is inadmissible. But, contrary to defendant's insinuations, it sets a threshold of presumed inadmissibility, not the outer limit of admissibility. It clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an "interest of justice" standard. We therefore review that determination for abuse of discretion. (Cf. *Branch, supra,* 91 Cal.App.4th at pp. 281–282; *Brown, supra,* 77 Cal.App.4th at p. 1337.)

The parties have not cited any cases specifically addressing the nature of the "interest of justice" inquiry under subdivision (e), nor have we located any such cases. We do agree with defendant, however, that some greater justification for admissibility is necessary under subdivision (e) than under section 352. Balancing under section 352 is required even under subdivision (a), where the presumption runs in favor of admission. By including a specific "interest of justice" requirement under subdivision (e), the Legislature must have intended to require a more rigorous standard of admissibility for remote priors.

■ That having been said, the "interest of justice" requirement obviously was not intended to present an insurmountable obstacle to admission of more remote prior conduct. Nor do we think subdivision (e) necessitates an inquiry different in kind from that involved in a determination under section 352. The section 352 balancing approach gives consideration to both the state's interest in a fair prosecution and the individual's constitutional rights. We believe this same type of analysis is appropriate for the "interest of justice" exception under subdivision (e).

To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e). Under subdivision (a)(1) and section 352, evidence may be excluded only where its probative value is "substantially outweighed" by its prejudicial effect. Though it reversed the presumption in subdivision (e), we believe the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales.

Thus, the "interest of justice" exception is met where the trial court engages in a balancing of factors for and against admission under section 352

and concludes, as the trial court did here, that the evidence was "more probative than prejudicial." While we need not and do not hold this is the only means by which the "interest of justice" finding may be justified, we certainly find the statutory prerequisite for admissibility was met in this case.

### D. *Any hypothesized error in the admission of evidence was harmless.*

Finally, even if we were to conclude the evidence was improperly admitted, we could not agree its admission was prejudicial. Evidence of prior misconduct surely could result in reversible error in a close case—which this was not.

The evidence of guilt was extremely strong. Though the defense appears to have been one of mistaken identity, there was no genuine defense under that theory. This was not a stranger identification in which mistaken perception could have played any viable role. Defendant and the victim had been friends for many years and intimate domestic partners for two years. They were engaged in a conversation in the parking lot just before Henderson was shot. Henderson identified "Mookie" as the shooter in a spontaneous declaration as she lay bleeding in the parking lot. Defendant certainly cannot deny he was at the scene. The fact that Henderson never saw a gun in his hand was because he contrived to shoot her while her back was turned.

There is no denying that Henderson was shot by someone, and all of the percipient witnesses testified defendant was the only person near her at the time.[16] It would have been physically impossible for Henderson to inflict the center back wound on herself. The shooter was near enough to Henderson that the first shot temporarily deafened her. Witnesses inside and outside the childcare center testified the shots came from the vicinity of the daycare center and sounded "very close," "right outside the yard area."

Besides, Durr and Simpson also identified defendant as the man in the parking lot with Henderson. And defendant fled the scene immediately after the shooting, without checking on Henderson's welfare. If the shots had been fired by someone else, one might have expected him to call 911 instead.

In light of the foregoing evidence—not to mention defendant's prior threats and proven motive—the far-fetched defense that there was another, phantom gunman in or near the parking lot was, in a word, ludicrous.

---

[16] The only other people in sight were two Hispanic men, who were standing outside a sheet metal factory at the end of the block, and some fellows outside the gym across the street. The testimony left it extremely unlikely that any of those people could have been the shooter.

Even a verdict of attempted second degree murder was extremely unlikely, given the strong evidence of premeditation and deliberation. After threatening on the phone to "put one in" Henderson, defendant arrived on the scene at the end of the workday, when the childcare center was clearing out. He brought a gun. He parked his car so as to block Henderson's escape and engaged her in a discussion of the breakup until she had made it clear she wanted to end the relationship. He stalled for 10 minutes, evidently waiting until he thought there were no witnesses. He then fired multiple shots from the rear at close range, left Henderson bleeding in the parking lot, and sped off in his car. The shot delivered to the center of Henderson's back strongly suggests a willful intent to kill.

Nor was an attempted voluntary manslaughter conviction realistically possible. The conversation immediately preceding the shooting did not amount to a heated argument, such that defendant's passions might reasonably have been aroused. Indeed, defendant's own attorney told the jurors there was no evidence he acted in the heat of passion, and that they should convict him solely of assault, even if they found he fired the gun.

In addition, the jury was instructed repeatedly on the presumption of innocence and cautioned not to conclude defendant was a "person of bad character" because of the prior domestic violence. Defense counsel also urged the jury not to convict defendant based on his prior misconduct. The prosecutor did not dwell unreasonably on the past incidents, but rather emphasized the strong evidence supporting the current charges.

We see no reasonable possibility of a verdict more favorable to defendant, even in the absence of the testimony about prior domestic violence. Thus, even assuming arguendo the evidence was inadmissible, the error in admitting it was harmless under any standard of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

III. *The Court's Ruling Under Section 1101, Subdivision (b) Was Proper, and the Instructional Error on This Point Was Harmless.*

The court also ruled that the same two prior incidents were admissible under section 1101, subdivision (b) on the issues of motive, intent, and lack of mistake. The court rejected the prosecution's argument that they were admissible as evidence of a common plan or scheme. Despite this ruling, the court instructed the jury that it could use the evidence of the prior incidents "for the limited purpose of determining if it tends to show a characteristic method, plan or scheme in the commission of the criminal acts similar to the method, plan or scheme used in the commission of the offense in this case . . . ."

Defendant claims both the ruling under section 1101, subdivision (b) and the instruction were erroneous. The Attorney General concedes the instruction was erroneous, but defends the ruling itself and dismisses the instructional error as harmless.

Having found no error in admission of this evidence to prove propensity under section 1109, we likewise find no error in its admission for these more limited purposes. It is true the court's instruction to the jury was inconsistent with its ruling on the scope of admissibility. Since the jury was instructed on the broader admissibility under section 1109, however, we fail to see how the "characteristic method, plan or scheme" instruction could have adversely affected the verdict. We are confident the instructional error was harmless under even the most rigorous standard of prejudice. (*Chapman v. California, supra*, 386 U.S. at p. 24; *People v. Watson, supra*, 46 Cal.2d at p. 836.)

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 29, 2010, S184552.