Filed 9/23/14  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LEONARD PAUL RODRIGUEZ,<br><br>    Defendant and Appellant. | F066505<br><br>(Fresno Super. Ct. No. F12906757)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Leonard Paul Rodriguez[1] was charged with inflicting corporal injury on his child's parent (count I – Pen. Code,[2] § 273.5, subd. (a)), false imprisonment by violence (count II – § 236), dissuading a witness by force or threat (count III – § 136.1, subd. (c)(1)), and second degree robbery (count IV – § 211). The information also alleged three prior prison terms. (See § 667.5, subd. (b).)

Before trial, defendant moved to exclude evidence of prior incidents that occurred between defendant and the alleged victim, Antoinette Ramirez.[3] The court tentatively discussed whether such evidence would likely be admissible. Ultimately, evidence pertaining to certain prior incidents was admitted at trial.

A jury convicted defendant on all counts. The court sentenced defendant to a total term of 8 years in prison, less 158 days of credit.

Defendant contends there was insufficient evidence that he inflicted corporal injury resulting in a traumatic condition. (See § 273.5, subds. (a) & (d).) As a result, he requests we reduce count I to misdemeanor battery.

Defendant next argues that the evidence of prior incidents between himself and Ramirez was improperly admitted. He posits that Evidence Code section 1109, which permits certain types of propensity evidence in domestic violence cases, is unconstitutional. He also submits the trial court erred in admitting the evidence under Evidence Code section 352.

We reject all of defendant's claims and affirm the judgment.

---

[1] We note that defendant's last name is spelled "Rodriquez" and "Rodriguez" throughout the record. It appears from pleadings and other reliable documentation that the correct spelling is "Rodriguez," and we therefore adopt that spelling throughout this opinion.

[2] All further statutory references are to the Penal Code unless otherwise stated.

[3] Antoinette Ramirez also uses the name Antoinette Garcia. We will refer to her as Ramirez throughout this opinion.

**FACTS**

Antoinette Ramirez (a.k.a. Antoinette Garcia) has been a correctional officer for years. She and defendant have two children together. At one point, Ramirez and defendant lived together for several weeks.[4] Ramirez and defendant broke up in March 2012.

*September 3, 2012*

On the morning of September 3, 2012, defendant called Ramirez and asked if she could take him to the store and then to lunch. Ramirez was seven months pregnant at the time. She brought her son along to pick up defendant at Roeding Park, where he lived.[5]

Around noon, defendant rented a motel room. At some point, Ramirez took her son home and returned to the motel room. That evening, Ramirez took a shower in the motel room. During Ramirez's shower, defendant began accusing her of "being with" someone else. Ramirez believed defendant was intoxicated or impaired in some fashion. Ramirez "didn't want to hear it" so she got out of the shower, got dressed and said she was going home.[6] Ramirez began gathering her "items" near a sink outside the bathroom. Defendant said, "[Y]ou're not going anywhere, you're staying here." Defendant pushed her into the bathroom.[7] Ramirez said she was calling the police. Defendant told Ramirez, " 'You're not gonna do shit, I'm gonna punch you in your stomach, you're not walking out of here.' " Defendant and Ramirez "were struggling in the bathroom" as Ramirez attempted to call the police and defendant tried to take the

---

[4] The precise length of their cohabitation is unclear. Ramirez testified that they lived together for "no more than a month." She also testified they lived together for two months.

[5] Defendant was homeless at the time.

[6] She told defendant three or four times that she wanted to leave.

[7] Ramirez qualified this testimony saying defendant "[p]retty much" pushed her "[p]retty much" with his chest.

phone away. Ramirez told defendant to stop. Defendant began "banging" Ramirez's hand on the tub to knock the phone out of her grasp. Her phone fell into the tub. Throughout their "struggle," defendant "constantly" said, "[Y]ou're not going anywhere," or some variation of that phrase. Ramirez pulled out her Taser and tased defendant. Defendant fell to the floor, and Ramirez "took off running out the door."

Eventually, defendant came out of the room and ran down stairs towards the motel office where Ramirez was. Ramirez pointed the Taser gun at him, and he ran past the motel room to an exit. Ramirez went back to the hotel room and looked for her cell phone but could not find it. Eventually, a police officer contacted Ramirez at the motel.

At around 9:30 p.m., Officer Cory Hastings began canvassing nearby areas. He was initially unable to locate defendant. At about 1:40 a.m. the next morning, Hastings saw defendant walking on a sidewalk. Defendant saw Hastings and ran into the parking lot of a nearby motel. Hastings found defendant sitting down, apparently trying to hide behind a vehicle. Defendant smelled of alcohol, his speech was slurred, and his eyes were red and watery.

Officer Hastings arrested defendant and searched him. He located a phone in defendant's shorts pocket. Hastings had another officer call Ramirez's number. When he did so, the phone found on defendant rang. Hastings answered the call and was connected to the other officer. At that point, defendant yelled out, "That bitch has my phone, so I took" her phone.

During their struggle in the motel room, defendant had "head butt[ed]" Ramirez four or five times. The "head butts" hurt Ramirez and she "felt it later." Specifically, Ramirez felt a knot on her head, though it was not visible. She did not go to the hospital and returned to work the next day. An officer who responded to the scene did not observe any visible injuries on Ramirez. The motel clerk was asked whether he saw any bruises or cuts on Ramirez, and he answered: "I just seen [*sic*] her crying that's all."

4.

Ramirez wrote a letter stating she did not want to "press charges" against defendant. Ramirez did not want defendant prosecuted because she loved him, he is the father of her children, and he's "a good person" when he is sober.

*Prior Incidents*

April 15, 2010 Incident

Ramirez testified to a prior incident that occurred on April 15, 2010. She and defendant were dating at the time. Defendant came to visit her some time after 9:00 p.m. Defendant, who was intoxicated, wanted to come into Ramirez's home, but she would not let him. He said he would drink a beer on her porch and then leave. Ramirez eventually checked outside to see if defendant had left. She saw that her vehicle's windshield "had a brick through it," and that her mirrors had been broken.

Ramirez walked down to the street to where defendant's friend lived. Defendant was outside the residence, and Ramirez asked him whether he broke her windshield. Defendant became angry. It looked to Ramirez as if defendant was going to throw something at her so she "took off." Defendant approached her car "like he was gonna throw something" at it. Ramirez "accidentally stepped on the gas trying to get away, and accidentally ran him over." Ramirez was given a citation but no charges were filed in connection with the incident.

February 12, 2011, Incident

On February 12, 2011, an Officer Eloy Escareno was dispatched on reports of a "disturbance with a male who refused to leave the location." When Escareno arrived, Ramirez was upset because defendant had come to her house and was "very belligerent, was drunk, was loud." After at least 10 minutes, a fire engine arrived with its lights and sirens activated. The fire captain told Escareno that they had received a 911 call that a child was having difficulty breathing. Escareno called dispatch to learn what phone number had placed the 911 call. Escareno confirmed with Ramirez that the phone number belonged to defendant. Escareno then used Ramirez's cell phone to call

defendant. A male answered and said, " 'Ha ha ha, I got you, bitch. Now I'm gonna get you in trouble.' " The male continued to talk and laugh, but Escareno did not recall what the male spoke about. The male then hung up. Escareno waited a couple minutes and called the number again. The male said, "F**k you, bitch, f**k you." Escareno then identified himself as a police officer. The male said Escareno "had nothing on him" and "couldn't do anything to him." The male then said, "F**k you, come get me if you can find me." Escareno was unable to locate defendant.

June 2011 Incidents

On June 1, 2011, Ramirez called 911. An officer responded and Ramirez was given an emergency protective order against defendant.

On June 3, 2011, defendant left several voicemails for Ramirez. In one message, defendant said, "When I catch you, I'm going to f**k you up." In another, defendant said, "I'm a crazy mother f**king [M]exican." Ramirez called law enforcement and had defendant served with a temporary restraining order.

On June 4, 2011, Ramirez again called police because she interpreted certain voicemails from defendant to be threats against her children.

Ramirez was "pretty sure" defendant left further voicemails on her phone around June 19, 2011.

Defendant pled no contest to charges of making criminal threats (Pen. Code, § 422) "in connection with events alleged to have occurred on June 19th, 2011 .…" Ramirez had not wanted defendant prosecuted.

Sometime around June 2011,[8] Ramirez had video surveillance equipment installed at her home. The system recorded defendant throwing a brick through Ramirez's front

---

[8] When asked if she installed the video surveillance in June, Ramirez said, "Um, probably, yes."

window on June 30, 2011. The system also recorded defendant pulling Ramirez's pool sweep out of the water and throwing it over a fence.

February 2012

Ramirez also testified that on a day in February 2012, defendant was watching their son while Ramirez was at work. Ramirez's mother called her at work and said defendant sounded like he had been drinking. Ramirez left work and came home to find beer bottles around the house. She asked defendant to leave, but he did not want to. Ramirez told defendant that she was going to call the police. Defendant left the home, so Ramirez "cancelled with" the police. Ramirez went outside to move her car because she did not want defendant "to go mess up my car." As she was moving her car, defendant approached her angrily and began cussing at her. Ramirez felt threatened so she tased him. Defendant apologized and said he would leave. Ramirez disconnected the Taser prongs, and defendant left.

April 13, 2012, Incident

On the morning of April 13, 2012, Officer Manuel Robles responded to a report that an adult male was possibly high on methamphetamine. Robles contacted a female on scene who told him that "nothing was going on," and defendant was probably making the calls. Robles went inside the home and confirmed that "there was nothing going on." Ramirez said she wanted to file charges against defendant.

Officer Robles called the number that had made the false emergency call. A male answered the phone and eventually admitted he was "Leonard Rodriguez" (defendant). Robles told him the number had been used to make a false police report and to violate a restraining order. Defendant said he didn't "give a f**k." Defendant also said "he knows that he's in violation for calling the female, but the female calls him, she picks him up" so "he's gonna continue to violate the restraining order if the female wants him around." Defendant said "he's the one that made the false police calls … to cause problems against the victim because he wanted to see his kid."

7.

July 2012 Incidents

On July 5, 2012, Ramirez contacted law enforcement because defendant was harassing her at work. Defendant would call Ramirez and curse repeatedly.

On July 14, 2012, officers responded to Ramirez's home on a report of shots fired. Officers arrived with guns drawn. Ramirez told them "there's nothing going on." The officers did "a quick sweep and left."

On July 17, 2012, defendant called 911 saying he was in Ramirez's house tied up in the garage. Officers arrived and Ramirez explained to them that this had "been happening all week."

On July 21, 2012, officers again responded to Ramirez's home. Ramirez testified: "I guess [defendant] was saying my son was smoking and smoking." Later that night, an officer was informed by dispatch that defendant had been located and stopped. The officer went to defendant and observed he was slurring speech, smelled of alcohol, was acting belligerently, and had red eyes and an unsteady gait. The number of a cell phone found on defendant's person matched the number that had been placing the false emergency calls.

Defendant was convicted of falsely reporting an emergency (Pen. Code, § 148.3, subd. (a)) after pleading no contest.

*Marriage and Family Therapist*

A licensed marriage and family therapist testified as a domestic violence expert for the prosecution. The expert explained that victims often minimize what happened to them, alcoholism increases the severity of the abuser's violence and verbal assaults, and victims can testify with an emotionless response because they become "numb" in the course of developing "learned helplessness."

8.

**DISCUSSION**

I.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S CONCLUSION THAT RAMIREZ SUFFERED A "CORPORAL INJURY RESULTING IN A TRAUMATIC CONDITION"

Defendant first contends that there was insufficient evidence that he inflicted a corporal injury resulting in a "traumatic condition." (See § 273.5, subds. (a) & (d).) As a result, he requests that we reduce count I to misdemeanor battery.

    *A.    STANDARD OF REVIEW*

"To resolve this issue, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. [Citation.]" (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1085.)

    *B. SECTION 273.5*

A defendant violates section 273.5 when he or she "willfully inflicts corporal injury resulting in a traumatic condition" upon the "mother or father of the offender's child." (§ 273.5, subds. (a) & (b)(4).) A " 'traumatic condition' means a condition of the body, such as a wound, or external or internal injury … whether of a minor or serious nature, caused by a physical force." (§ 273.5, subd. (d).)

    *C. ANALYSIS*

Defendant submits that because Ramirez's injury was not visible, did not necessitate medical treatment at a hospital or in an ambulance, and was not serious enough to prevent her return to work the next day, it was not a "traumatic condition" under section 273.5.

Any momentary attractiveness to defendant's argument stems from common usage of the term "traumatic." Sometimes, words like "trauma" are used in common parlance to convey a certain level of severity or substantiality to an injury. (See *United States v. Moses* (6th Cir. 1998) 137 F.3d 894, 899 [one common meaning of "trauma" is " 'emotional wound or shock that creates *substantial*, *lasting damage* …' " (italics

9.

added)].)  Perhaps Ramirez's injuries would not qualify as "traumatic" under that particular usage of the term.  But the common usage is irrelevant here, because the operative phrase is statutorily defined.  And that definition of "traumatic condition" expressly includes injuries "of a minor … nature.…"[9]  (§ 273.5, subd. (d).)

Consequently, even though Ramirez's injury was arguably "minor," it nonetheless satisfied the requirements of section 273.5.[10]  Ramirez testified that defendant "head butted" her several times.  The "head butts" hurt Ramirez, and she "felt it later."  Specifically, she felt one knot at the top of her forehead the next day.  This constitutes substantial evidence that defendant "willfully inflict[ed] corporal injury resulting in" "a condition of the body, such as …  internal injury … caused by physical force."  (§ 273.5, subds. (a) & (d).)

Our conclusion is not altered by the fact that Ramirez's injury was not seen by the responding police officer or motel clerk.  An "internal injury … caused by physical force" is a "traumatic condition" just as much as an external one.  (§ 273.5, subd. (d).)  The jury was free to believe Ramirez's testimony that she sustained an internal "injury" to her head even though it was not observed by others.  On substantial evidence review, we assume the jury made such an inference and will not disturb the judgment.

---

[9] Defendant argues that to "elevate a knot or a bump on the head to a 'corporal injury resulting in a traumatic condition,' is to demean the English language." But to hold that an injury is too minor to qualify as a traumatic condition would demean the *statutory* language, which expressly encompasses injuries of "a minor … nature .…" (§ 273.5, subd. (d).)

[10] Defendant relies almost entirely on *People v. Abrego* (1993) 21 Cal.App.4th 133 in urging a different conclusion. Even assuming *Abrego* was rightly decided, it does not aid defendant here.  In *Abrego* there was "no evidence" the victim suffered "even a minor injury sufficient to satisfy the statutory definition." (*Id.* at p. 138.)  Here, there was evidence Ramirez did suffer an injury (i.e., one knot on her head).

II.    THE ADMISSION OF EVIDENCE REGARDING PRIOR INCIDENTS WAS
       NOT PREJUDICIAL ERROR

Defendant contends the court erred in admitting evidence of prior incidents involving himself and Ramirez.  He offers two lines of argument on this issue.  First, he contends that section Evidence Code[11] section 1109, which permits propensity evidence in domestic violence prosecutions, is unconstitutional.  Second, he contends that the trial court abused its discretion in failing to exclude the evidence under section 352.

A.  *LAW OF PROPENSITY EVIDENCE IN DOMESTIC VIOLENCE
    PROSECUTIONS*

"Except as provided in … Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (§ 1101, subd. (a).)

With exceptions not applicable here, section 1109 provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  (§ 1109, subd. (a)(1).)

Under section 1109, "evidence of past domestic violence inadmissible *only* if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact."  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531, italics added, fn. omitted.)  In other words, section 1109 renders section 1101 inapplicable in domestic violence cases.  However, the evidence must still satisfy section 352.

---

[11] All further statutory references are to the Evidence Code unless otherwise stated.

## B. *SECTION 1109 IS CONSTITUTIONAL*

It is at this juncture where defendant's first contention impacts our analysis. He posits that section 1109 is unconstitutional. If we agreed, there would be no operative exception to section 1101 applicable to this case. However, for the reasons explained below, we reject defendant's premise. Consequently, section 1109 remains in effect and operates to exempt the evidence in this case from the reach of section 1101.

### 1. *People v. Falsetta*

The Supreme Court's decision in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) is instructive. In *Falsetta*, the high court upheld a similar statute – section 1108[12] – as constitutional. (*Falsetta*, *supra*, 21 Cal.4th at p. 907.)

Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) Thus, section 1108 – like section 1109 – creates an exception to section 1101.

The *Falsetta* defendant argued that section 1108 "violates due process principles by allowing admission of 'propensity' evidence." (*Falsetta*, *supra*, 21 Cal.4th at p. 910.) The Supreme Court rejected the constitutional challenge, noting that section 1108 was limited to evidence of prior sex offenses and thus did not permit "far-ranging attacks on the defendant's character." (*Id*. at p. 916.) Moreover, section 1108 "expressly permits trial courts to exclude evidence of other crimes under section 352." (*Falsetta*, *supra*, at p. 916.) As a result, the Court held that "section 352 save[d] section 1108 from defendant's due process challenge." (*Id*. at p. 917.)

---

[12] Section 1108 is a "parallel provision" to section 1109. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1162.) The two provisions "can properly be read together as complementary portions of the same statutory scheme." (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1333.)

2. Analysis

We see no basis for distinguishing *Falsetta*'s reasoning with respect to section 1109. As in *Falsetta*, section 1109 does not permit far-ranging attacks on the defendant's character. (See *Falsetta*, *supra*, 21 Cal.4th at p. 916.) Rather, it limits its reach to defendant's prior acts of domestic violence in domestic violence prosecutions. (§ 1109, subd. (a).) And, section 1109 – like section 1108 – expressly permits trial courts to exclude evidence of other crimes under section 352. (See *Falsetta*, *supra*, 21 Cal.4th at p. 916.) Therefore, we conclude that section 352 protects section 1109 from defendant's due process challenge. (See *Falsetta* at p. 917; accord, *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310 [also rejecting equal protection challenge]; *People v. Brown*, *supra*, 77 Cal.App.4th at pp. 1332–1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026–1029; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419–420.)

C. *THE TRIAL COURT DID NOT ABUSE ITS DISCRETION UNDER SECTION 352*

Defendant next contends that even if section 1109 is constitutional, the trial court nonetheless abused its discretion in admitting the evidence under section 352. Again, we disagree.

Section 352 "requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect.…" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047, italics in original.) We review the trial court's ruling under section 352 for abuse of discretion. (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 531.)

The Legislature has determined "that in domestic violence cases … similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.]" (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 532.)

> "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that

13.

scheme usually escalates in frequency and severity….” (*Id*. at p. 532, fn. 8, quoting Assem. Analysis of Sen. Bill 1876, pp. 3–4.)

The prior incidents discussed at trial demonstrate that defendant has, on several occasions, become intoxicated and proceeded to curse at and threaten Ramirez. Some of the incidents further illustrated that defendant’s inappropriate conduct often escalated until Ramirez responded with force. There was evidence defendant acted in a similar fashion on September 3, 2012, during the events underlying the present case.[13] Consequently, we conclude the prior incidents were very probative.

Defendant argues the evidence was prejudicial because it “created a jury predisposed to believe that he was the kind of person who would assault Ms. Ramirez.” He also posits the evidence was prejudicial because the jury was not instructed to avoid inferring guilt from the prior incidents. But there was no need to instruct the jury not to make propensity inferences because such inferences were permissible. (See *People v. Reyes* (2008) 160 Cal.App.4th 246, 250–253; see also *People v. Pescador* (2004) 119 Cal.App.4th 252, 259–261; cf. *People v. Villatoro*, *supra*, 54 Cal.4th at pp. 1165–1167 [rejecting a similar instructional claim regarding section 1108].) The court properly instructed the jury that it *could* indulge a propensity inference but was not required to. The court also instructed the jury that the evidence of prior incidents of domestic violence “is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged.” We therefore reject defendant’s claim of instructional error. (See *People v. Reyes*, *supra*, 160 Cal.App.4th at pp. 250–253.)

---

[13] It is true that defendant was able to batter Ramirez on September 3, 2012, but was apparently unable to do so during the prior incidents. But one of the rationales behind section 1109 is the fact that “ ‘[w]ithout the propensity inference, the escalating nature of domestic violence is … masked.’ ” (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 532, fn. 8.) The evidence that Ramirez stopped defendant before he could make physical contact does not render the prior incidents inadmissible.

To have prevailed under section 352, defendant needed to have demonstrated that the evidence uniquely tended to evoke an emotional bias against him.  (See *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35.)  " ' "[P]rejudicial" is not synonymous with "damaging" ' " (*ibid.*), and all defendant has shown here is that the evidence presented was damaging.

## DISPOSITION

The judgment is affirmed.


_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.