Filed 4/28/16  P. v. Walker CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G052145 |
| v. | (Super. Ct. No. RIF1103234) |
| DRAKE VON WALKER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Bernard Schwartz, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Drake Von Walker of the first degree murder of his live-in girlfriend, Maisha Walters. He also admitted a 1992 prior "strike" conviction for the voluntary manslaughter of his former wife, Josephine Cherry. The court sentenced defendant to an indeterminate term of 50 years to life.

The trial court admitted evidence of defendant's history of domestic violence with both Cherry and Walters, and evidence about Cherry's death. Defendant argues the court abused its discretion and violated his constitutional right to due process and a fair trial by admitting this evidence under Evidence Code section 1109 (all subsequent statutory references are to this code). We disagree and affirm the judgment.

**FACTS**

*Crime Scene*

Around 1:30 p.m., on June 24, 2011, defendant walked into the Riverside Police Department and asked to speak to a homicide detective. He was sweating and anxious, and he got agitated when the desk officer asked him a few questions.

About five minutes later, Riverside Police Detective Richard Wheeler took defendant to an interview room. Defendant identified himself. Wheeler advised defendant of his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights, and defendant waived those rights. He told Wheeler, "There's a woman in my apartment [that] doesn't seem to be breathing."

Wheeler dispatched police and emergency personnel to defendant's apartment. They found Walters's body in the master bedroom. She was lying on her back on the bed, and she had a blanket up to her neck. Walters had a black eye, abrasions, and bruises on both sides of her face. There was dried blood inside her mouth and nostrils, and bite marks on her back and neck. Blood, possibly menstrual blood, was found around Walters's crotch area, but there was none on the sheet under her body.

Police officers also found a wet T-shirt caked with powdered laundry detergent and a roll of white trash bags in the living room. There were a couple of four-

2

to-five-inch spots of dried blood at the entrance of the bedroom and next to the bed. Officers noticed a fan on the bed. There were blood spots and pieces of hair on the fan, and there was a blood-stained pillow wedged behind the door. Sheets matching the sheet under Walters's body were found just inside the front door.

Toni Arambula, the resident manager of defendant's apartment complex, told the officers that at about 8:00 a.m. that morning, he saw defendant throw either a basket, or a couple of big trash bags, into the apartment complex's garbage bins.

After looking at video surveillance footage, crime scene technicians retrieved two white trash bags from the dumpster. Inside one of the bags, detectives found a document titled "Rules and Regulations," which listed six rules, such as, "Must be awake by 9:00 every day." The document was in Walters's handwriting. Another document in her handwriting was entitled, "My promissory note," and purported to acknowledge a debt Walters owed defendant. There was also paperwork in defendant's name.

According to an autopsy, Walters's body showed signs of blunt force trauma to the head, along with acute injuries to her upper lip and gums. Other injuries around her mouth, and the presence of fluid in her lungs, were consistent with smothering. However, the findings were not conclusive, and Walters' also had a potentially toxic level of methamphetamine in her bloodstream. Thus, the forensic pathologist was unable to determine the cause of Walters's death.

*Defendant's Statement*

Wheeler received information from the crime scene while he took defendant's statement. A few minutes into defendant's interview, Wheeler confronted him with the fact of Walters's death. At that point, defendant identified Walters as his live-in girlfriend, and he said Walters's daughter lived with him "from time to time." Defendant told Wheeler that "[Walters] would leave the apartment for hours to days at a time and then just come back to the apartment, in his words, 'tore up.'"

3

Defendant explained that Walters left their apartment sometime during the morning of June 22 to get drugs. She returned the next day, June 23, although defendant could not recall exactly when. Defendant said Walters returned to their apartment "tore up" and high. Defendant tended to Walters's injuries and let her sleep. The next morning, June 24, Walters appeared to be sleeping, so defendant quietly left the apartment around 7:00 a.m., and he was gone all day running errands. When defendant returned to the apartment around 6:00 p.m., he realized Walters had stopped breathing. Defendant did not report her death right away. Instead, he went to bed and cried. The next morning, he got up, took a shower, and decided to go to the police.

During a break in the interview, Wheeler learned about the video surveillance footage from defendant's apartment complex, and he questioned defendant about his laundry basket and whether he had taken out the trash that morning. At that point, defendant admitted taking two garbage bags to the dumpster, but he could not recall what happened to his laundry basket, and he adamantly denied trying to clean up the apartment before he left.

Defendant denied any history of domestic violence with Walters. He also denied past domestic violence. Defendant said Walters's injuries, or her menstrual cycle, explained all the blood in their apartment. He had no explanation for the blood spots on the fan and pillow, and he said the fan and pillow were in their usual places.

Wheeler mentioned there were bite marks on Walters's body. Defendant denied causing the bite marks, but he said Walters frequently had them. Defendant also claimed memory loss, but under continued questioning, he admitted, "I might need a psychologist." Defendant denied suffocating or otherwise harming Walters.

Wheeler also learned of the 1992 homicide. When he confronted defendant with, "You went to prison for hurting a woman[,]" defendant said, "Yeah, of course." Wheeler commented on the similarities between Cherry's 1992 death and Walters's

4

death. He told defendant, "This is not gonna go away, Drake." Defendant replied, "Sir, I am already dead."

Defendant said Walters committed suicide. While he wanted to accept "full responsibility," defendant also said he had not taken his medication. Defendant explained the video surveillance footage away by claiming it had been taken a couple of days before the murder.

*Defendant's Telephone Calls*

During his incarceration, defendant made several incriminating telephone calls to his brothers, son, and daughter. He told one brother he should be in a "pysch" hospital, he would "play the part" during court appearances, and he expressed the desire for a plea agreement. He did not deny killing Walters when pressed, and he referred to the Innocence Project as a potential source of help with his case. He also mentioned that someone who commits a nearly identical crime 14 years later must be mentally unstable. Defendant told his daughter that the results of the autopsy were a "blessing," and his son that he had done "some stupid shit" and "for the second time."

*Prior Manslaughter Evidence*

In 1992, defendant lived with Cherry, and Cherry's daughter, Amia Kelly, in an apartment in Los Angeles County. On the night of June 26, two deputy sheriffs were dispatched to defendant's apartment due to a report of someone there having difficulty breathing. When the officers arrived at the apartment, defendant met them and said Cherry was in the bathroom. Defendant told the officers Cherry committed suicide.

Cherry was found in the bathtub. She was mostly nude, cold to the touch and stiff. Paramedics quickly determined Cherry had been dead for some time. Her body had multiple stab wounds, bite marks, and lacerations, and there was a large kitchen knife next to one of her legs. There was blood on the bathroom floor, and a pair of blood-soaked, men's corduroy pants on the toilet. However, the bathtub contained neither blood, nor water. The absence of blood in the bathtub, despite the number and severity of

5

Cherry's injuries, led detectives to believe she had been attacked in the master bedroom and moved.

Furthermore, the deputies reported that the apartment smelled of blood, and as police and firefighters moved from the front door to the bathroom, they saw blood in drops, smears, and splatter, on nearly every wall. There were pools of blood on the floor in the living room and master bedroom. The apartment was sparsely furnished, and common household items and pieces of broken glass were strewn amidst piles of clothing and cardboard boxes.

At the scene, defendant was crying and said, "I don't know what happened; I left her." When questioned, defendant first said that he had a fight with Cherry. She tried to stab him, and she knocked him out with an ashtray. When he woke up, he thought Cherry had left the apartment, but he noticed the closed bathroom door and called her name. Defendant said he broke down the bathroom door when he realized Cherry was inside. However, he was vague on timing.

Defendant next said they argued, she tried to stab him, and she hit him with an ashtray, but this time defendant said Cherry left the apartment because she wanted money to buy drugs. When he woke up, the bathroom door was closed. When he opened the door, he found Cherry in the bathtub.

After receiving a *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) advisement, defendant told police he and Cherry were in the process of separating. They got into a fight after using drugs. He said Cherry stabbed him in the chest with a large kitchen knife, and he bit her, maybe four times. He denied killing her. Defendant insisted Cherry was suicidal, and he claimed she stabbed herself in the neck multiple times.

However, there was no evidence anyone had broken down the bathroom door, nor evidence defendant suffered a head or chest wound, or that he had been knocked unconscious. When confronted with these facts, defendant became defensive

6

and aggressive, and he told the officers, "You guys are trying to confuse me, and I really don't remember. I'm traumatized by all these events."

Defendant pled guilty to voluntary manslaughter in connection with Cherry's death on the condition he receive a 12-year prison term. He served his term and was discharged from parole in 2002.

*Prior and Current Domestic Violence Evidence*

Cherry's daughter Kelly was 11 years old when defendant killed her mother. She said their relationship was violent, and she often heard defendant yell and call Cherry names. He also threatened her with a knife he kept under their bed. Kelly testified defendant would not let her mother leave their apartment without permission, and he frequently used physical violence to restrain her. Kelly also said her mother was trying to leave defendant when she was killed.

Walters's 14-year-old daughter, K.B., said she had not lived with her mother in 2011, but she was a frequent visitor to defendant's apartment. K.B. reported defendant initially treated her mother well. However, after they had been together for about two years, K.B. began to see various injuries on her mother's body. K.B. had seen bite marks, scissor marks, screwdriver marks, and cigarette burns. She saw her mother try to hide the injuries under clothing.

According to K.B., defendant forced Walters to use his cell phone. K.B. had to talk to defendant to talk to her mother. K.B. once saw defendant throw a lamp at her mother and choke her, and he threatened to kill K.B. and her mother if K.B. called the police. K.B. said her mother was addicted to methamphetamine that she got from defendant.

The prosecution also introduced evidence of a prior incident between defendant and Walters. About six months before Walters's death, she and defendant, who was then a student at California State University, Los Angeles, got into a verbal and physical confrontation at the school. Campus police officers responded. Walters had

7

several scars, bite marks, and cigarette burns on her body, and red marks around her neck. Walters attributed all her injuries to defendant.

Defendant left the scene, but was quickly found. When questioned, he told campus police officers Walters asked him for money and a ride home, and then she got into an argument with someone else in a hallway. Defendant said he was looking for his lost cell phone in the same hallway when Walters hit him on the left side of his face. Defendant also told the officer the "hysterical woman" involved in the incident was a prostitute. The officer testified defendant did not have any visible injuries.

About a month after the incident, defendant filed a complaint against one campus police officer involved. He submitted a sealed envelope with a type written statement from Walters. In her statement, Walters claimed to have filed a false police report, and she no longer wanted to press charges against defendant.

Walters's best friend, Karla Bellamy, testified that she saw scars and injuries on Walters. She also said Walters was too scared to report the abuse. In June of 2011, Bellamy also saw bite marks. Walters said defendant bit her during arguments. Bellamy took photographs of some of these injuries, including pictures of bite marks and cigarette burns.

Arambula, the apartment complex manager, testified that about a month before her death, Walters appeared at his doorstep very early one morning. She was topless, hysterical and very frightened. She had a large bite mark on her left shoulder, and she told Arambula defendant threw her out of the apartment and locked the door. Arambula gave Walters a T-shirt and told her, "You should not go back. He will hurt you." He did not call the police, and he saw Walters in the apartment the next day.

Christa Howell, one of defendant's neighbors, reported hearing a verbal argument between a man and woman sometime around 5:30 a.m. on the day Walters's died. The neighbor said verbal arguments were a common occurrence. This particular argument lasted for at least 30 minutes.

## DISCUSSION

Defendant argues the court abused its discretion and deprived him of due process and a fair trial in this domestic violence related murder prosecution, by admitting evidence of defendant's history of domestic violence against Cherry and Walters, and evidence about his role in Cherry's death in 1992. He contends all of this evidence should have been excluded under section 1109, subdivision (e).

The Attorney General correctly points out the domestic violence evidence and evidence of Cherry's death was also admitted for the independent purpose of proving intent, common scheme or plan, motive, or lack of mistake under section 1101, subdivision (b). Defendant does not challenge the admission of this evidence under section 1101, so his conviction could be affirmed on that ground alone. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [we review the ruling and affirm if correct on any ground].) Nevertheless, we will address his section 1109, subdivision (e) argument.

Under section 1109, the prosecution may introduce evidence of prior acts of domestic violence in a prosecution involving domestic violence, "if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) Section 1109 is a legislative recognition of the peculiar "psychological dynamic" involved in domestic violence crimes. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532 (*Johnson*).) "[T]he statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citations.]" (*Ibid.*)

However, subdivision (e) of section 1109 creates a presumption of inadmissibility if the prior domestic violence is more than 10 years old, "unless the court determines that the admission of this evidence is in the interest of justice." The interest of justice test is a more rigorous standard for admissibility, but it is satisfied when the court balances the factors for and against admission under section 352 and concludes the

9

evidence is more probative than prejudicial.[1] (*Johnson*, *supra*, 185 Cal.App.4th at pp. 539-540.) Thus, the court is required to determine whether the probative value of the prior acts of domestic violence substantially outweighs the potential for prejudice, and we review that determination for abuse of discretion. (*Ibid.*)

Generally, the trial court has broad discretion when evaluating the prejudicial effect of evidence versus its probative value. (*People v. Jones* (2011) 51 Cal.4th 346, 373.) The appellate court merely asks whether the trial court's ruling "exceeds the bounds of reason or is arbitrary, whimsical or capricious. [Citations.]" (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.) Here, defendant utterly fails to establish the court made an arbitrary or capricious decision to admit evidence of his history of domestic violence against Cherry and Walters, and his role in Cherry's death.

First, the court considered and rejected defendant's argument that evidence of Cherry's death, and his uncharged acts of domestic violence against her, were too remote in time to be probative, uniquely prejudicial, and would involve an undue consumption of time. The court believed the prosecution would expeditiously present the prior acts evidence, and the court determined this evidence was unlikely to confuse the jury, because "[t]he jury will be instructed certainly appropriately under CALCRIM as to how they're to take the evidence."[2]

Next the court considered the probative value of the evidence. It noted defendant had a well-established history of domestic abuse, which had twice progressed to the use of lethal force. In both cases, defendant abused his female cohabitants in

---

[1] Section 352 requires the court to determine if the probative value of the proffered evidence "is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[2] With respect to sections 1101 and 1109, the court gave CALRIM No. 375 (evidence of uncharged offense to prove identity, intent, common plan, etc.) and CALRIM No. 852 (evidence of uncharged domestic violence), respectively.

remarkably similar fashion. He threatened and demeaned both women, he restricted their movements and communication with others, and he lashed out by biting, burning, stabbing, and hitting them. Moreover, defendant gave similar alibis, and explanations, for each woman's death when questioned by police. Both women were viciously attacked and then left to die while defendant first claimed they were having difficulty breathing, and then asserted they were drug addicts and suicidal. All of this evidence was highly probative.

Furthermore, "[t]he prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in . . . section 352 applies to *evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

Here, the court carefully considered and weighed the relevant factors, and determined the evidence was substantially more probative than prejudicial. In doing so, the court neither abused its discretion, nor violated defendant's constitutional rights.

We also reject defendant's reliance on one juror's midtrial dismissal as proof the 1992 homicide evoked a unique emotional bias against him. According to the record, the juror said she could no longer keep an open mind based on defendant's statement he believed the autopsy results were a blessing. The juror feared having a closed mind when the autopsy results were presented the next day, and because of other evidence presented thus far. She did not mention the 1992 homicide. Furthermore, defendant's assertion other jurors may have felt the same way, but declined to tell the court, is pure speculation and unsupported by evidence in the record.

11

## DISPOSITION

The judgment is affirmed.


                                    THOMPSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.