Filed 5/20/16  P. v. Orenday CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AMERICUS DE ORENDAY,<br><br>    Defendant and Appellant. | D067572<br><br><br><br>(Super. Ct. No. SCD251056) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Americus De Orenday of first degree murder.  (Pen. Code, §187, subd. (a); count 1.)  The court sentenced De Orenday to prison for 25 years to life.

De Orenday appeals, contending the court erred in admitting evidence of De Orenday's prior uncharged bad acts. We affirm.

## FACTUAL BACKGROUND

### Prosecution

After a two-month courtship, De Orenday married Mirella Carmen Alas de Gelan in July 2004. Mirella had two children from a prior relationship: Anthony and Leslie, 11 and eight years old. De Orenday had three children: Michael and David, around 10 and nine years old, respectively, and America, age five. Together, De Orenday and Mirella had a daughter, Galilea, and twin sons, Americus and Ramses.

In fall 2011, after Anthony graduated from high school, De Orenday kicked him out of the house. De Orenday and Mirella had argued regularly, but after De Orenday evicted Anthony, their arguments progressively worsened, and by 2012, they were sleeping separately (De Orenday in the bedroom and Mirella on the living room couch).

De Orenday and Mirella eventually separated and moved into separate apartments in San Diego. Leslie, who worked with Mirella at a Popeye's fast food restaurant, lived with her, as did the three children Mirella had with De Orenday. De Orenday and Mirella arranged informally that their three children would stay with Mirella five nights a week and De Orenday the other two. When they met to exchange the children, their interactions were curt.

Shortly after moving into her new apartment, Mirella began dating Anthony Shaw, another Popeye's employee. Shaw, also known as Anthony Lewis, regularly visited Mirella's apartment.

2

In August 2013, De Orenday's daughter America visited Mirella and the three young children at Mirella's apartment. She met Shaw and later told De Orenday about him. Galilea also told De Orenday about Shaw. De Orenday was upset and angry, and he told America that he had suspected Mirella was cheating on him.

One morning that month, De Orenday went to Mirella's apartment, looking serious and angry. Leslie saw De Orenday approaching the apartment and blocked him at the front door, refusing his demands that she move out of the way. Shaw was in the apartment, and De Orenday yelled at him angrily and threatened to harm him. De Orenday asked Mirella to come out onto the second floor landing outside the apartment, which she did. Their conversation began calmly but became heated. De Orenday and Mirella separated, and De Orenday returned to his car while Mirella locked up her apartment in order to go to work.

Mirella, Leslie, and Shaw walked to Mirella's car, got in, and drove to work. De Orenday, however, followed them in his truck. Mirella, seeing De Orenday, pulled over and got out of her car. De Orenday pulled over, got out of his truck, and spoke briefly with Mirella before walking to where Shaw was seated in Mirella's car. He pounded on the car window and yelled at him that Mirella still loved him and they still had sex. He told Shaw to get out of the car. After he did, De Orenday yelled at him, "Why are you with my wife?" Shaw retorted, "She is not your wife anymore," and he and De Orenday argued for several minutes before De Orenday returned to his truck, got in, and drove off.

3

A day or two later, Mirella, Leslie, and Shaw went to De Orenday's apartment to pick up the three children. Mirella telephoned De Orenday several times while in route to let him know they were coming, but De Orenday never answered. After arriving at De Orenday's apartment, Mirella and Leslie knocked on the door several times. After about 15 minutes, the police arrived, and De Orenday finally answered the door. The police served Mirella with a restraining order that De Orenday had obtained that barred Mirella from visiting De Orenday or their three children. The restraining order listed September 16, 2013, as the date on which Mirella could contest it in court.

Although upset by the restraining order, Mirella did not violate it. De Orenday, however, began to appear regularly at the Popeye's. He would follow Mirella and pass by her as she drove around town. He telephoned Popeye's, claimed to be a customer and asked for Shaw's work schedule as well as Mirella's personal information so he could drop off a gift with her. De Orenday twice drove past Shaw's house, frightening him. De Orenday told the property manager at the apartment complex where he lived that he "could not believe" Mirella was dating Shaw.

In late August 2013, America returned to Texas to go to school. About two weeks later, De Orenday told America by telephone to call him every day or he "might do something stupid."

On September 16, 2013, Mirella, accompanied by Leslie and Delia Gonzalez, Mirella's longtime friend, went to court to contest the restraining order. Mirella successfully obtained a change in the terms of the restraining order to allow her to see her

4

children for eight hours each week under supervision. After the hearing, De Orenday met briefly with his attorneys in the courthouse lobby before visibly storming out.

Sometime later, Leslie, who had never given her telephone number to De Orenday, received a call from him. De Orenday told Leslie to tell Mirella to separate from Shaw, but Leslie hung up on De Orenday, telling him she did not want to speak with him and that he was not to call her. De Orenday, however, called and texted her numerous times, prompting her to contact the police.

De Orenday also telephoned Delia Gonzalez. He told Gonzalez that Mirella had a new boyfriend who was "very young," that he would withdraw the restraining order against Mirella if she would reunite with him, and Mirella would be with him "whether she likes it or not." De Orenday telephoned Gonzalez's son, and sounding "very upset," told him that Mirella was "his property," "no one else can have her but him," and he would "have her [his] way or the bad way."

Shaw and Mirella became engaged on September 17, 2013.

On September 21, 2013, De Orenday, who earlier that month had sent multiple Facebook messages to Mirella's younger sister Sonia Elizabeth de Gelan, asking that she put him in touch with Mirella's mother, left Sonia a long cryptic voicemail message with religious overtones, including words to the effect of "[t]he sin is very expensive and all sin is paid for in death."

That evening, De Orenday drove to Mirella's apartment, taking Galilea, Americus, and Ramses with him, although there was no supervised visit scheduled for that night. After arriving at the apartment complex, and while seated inside his truck, De Orenday

5

told the three children that Shaw was "trying to take [his] wife away" and said, "if he's there, what would you guys do if I kill him?" He added, "maybe I'll kill your mother too."

De Orenday and the three children walked up to the second floor landing and peered into Mirella's apartment through the front window. De Orenday pushed the children's heads down and the four of them went to the front door. The children opened the door, which was unlocked, and Mirella and Leslie greeted them with hugs. When they looked up, they saw De Orenday standing in the doorway, asking Mirella to "step outside" because he "needed to talk to her." Leslie told Mirella not to go with De Orenday, but Mirella, appearing fidgety and nervous, glanced at Leslie "like she was thinking about it." She said to Leslie, "I'll be right back. Take care of your brothers, I'll be quick," and walked toward the door. De Orenday motioned for Mirella to follow him. Appearing reticent, she followed him and they both walked out of view.

About 10 minutes later, Leslie went outside, but could not find either Mirella or De Orenday. She searched the apartment complex parking lot and its adjoining street before returning to the apartment and calling the police. She telephoned the police again several minutes later. An officer responded and told Leslie to wait until the morning and to contact the police again if Mirella had still not returned by then. Shaw came over, searched around the block for Mirella, and he and Leslie stayed up all night trying to reach De Orenday's cell phone. All telephone calls to De Orenday's phone went either unanswered or directly to voice mail.

6

The following morning, Leslie reported to the police that Mirella had not returned. The police went to De Orenday's apartment and knocked on the door, but no one answered. They went to Mirella's work, but she was not there. They returned to and entered De Orenday's apartment with the assistance of the apartment management. Mirella and De Orenday were not there, and there were no signs of a struggle. A missing person report was filed.

A little more than 48 hours after Mirella had disappeared, De Orenday appeared outside the San Diego Police headquarters in downtown San Diego. He was disheveled and irritated, and he had multiple cuts and scratches on his arms. He flagged down a group of police officers and detectives just entering the building and directed them to his yellow truck, parked nearby. He told them his wife was in the truck and that she was dead, and he gave them his truck keys. The police approached the truck and saw, attached to its exhaust pipe by duct tape, a grey hose that led over the truck bed and into the passenger compartment through its rear center window, which had also been duct taped at its seams.

Inside the truck, they found Mirella's body lying on her right side on the rear floorboard, underneath a blanket, with her clothing cut along her entire left side. She had been strangled to death approximately 24 to 36 hours prior and her body had been left in the position in which it was found for at least eight hours.

The police took De Orenday to the hospital because of the injuries to his arms. At the hospital, De Orenday said that he had learned from his children that Mirella had been cheating on him with an 18-year-old man. He said that Mirella denied cheating on him,

7

which he felt made him and the children appear to be liars. He said that he had not slept for days; that he had cut himself with the box cutter over "family issues"; and he had used a turkey baster to try to "drain the blood from his carotid artery." De Orenday stated that he had gone to a Walmart store and purchased a hose, which he duct taped to the truck exhaust pipe. He sealed the truck windows and tried to kill himself by running exhaust into the cab of the truck, but then "had an image of his kids that cropped in his head and at that point . . . turned himself in to the police."

De Orenday's truck was impounded and searched. In its passenger compartment, the police found a box cutter, two large syringes, a pair of green men's underwear with a bloodstain on it, and a used menstrual pad. They also found two McDonald's receipts, one of which came from a store less than two blocks away from the downtown police station bearing a date and time of purchase of September 24, 2013, at 1:05 a.m.; two Walmart receipts, including one showing the purchase of a hose on September 23, 2013, at 8:43 p.m.; and a roll of duct tape that matched the duct tape De Orenday used to seal the window and attach the hose to the exhaust.

In the pocket of the driver's side door, the police found a handwritten note dated August 22, 2013. De Orenday had written "me" in the center of the note followed by a plus sign and then Mirella's name, with the "M" in her name circled. Underneath the names were two sets of letters that were in apparent reference to their children: M., D., and A., and G., A., R., T., and L. At the top of the note was written "hedge of protection"; underneath it was a square in which De Orenday had written "blood of

8

Christ." To the left of the square were writings that appeared to be Biblical references; to its right, the words "heal her," "restore," and "renew."

The police the box cutter and the green underwear found in De Orenday's truck DNA tested. De Orenday was the major contributor of DNA found on the box cutter handle, and his DNA was not found to a measurable level on the box cutter blade. Mirella's DNA matched the "predominant" DNA found on the blade, and she was a minor contributor to the DNA found on the handle. Mirella's DNA matched the DNA found in the bloodstain on the green underwear, and De Orenday was excluded as a possible donor of it.

The police then executed a search warrant on De Orenday's apartment. They found, on De Orenday's dining room table, handwritten notes listing the various degrees of homicide and the legal principles related to each. In those notes, De Orenday wrote, among other things, "intent to kill," "specific intent," "murder, general intent," "premeditated," "felony murder rule," "special circumstances," and "conscious disregard." De Orenday also wrote a definition for voluntary manslaughter that had the words "heat of passion" written in capital letters, and he wrote, but then crossed out, the words "premeditated design." The police also found a handwritten reference to the movie "Law Abiding Citizen," in which the main character witnesses his wife and daughter being sexually assaulted and murdered and then kills the perpetrators before turning himself in to the police.

In addition to those notes, De Orenday had also left other handwritten notes on the dining room table that contained the contact information for Mirella, Shaw, and the

9

Popeye's restaurant where they worked as well as notes that referenced the restraining order De Orenday had obtained against Mirella. In addition, the police found notes that listed self-help tips for resuscitating De Orenday's relationship with Mirella (such as "Go with the flow," "Win their heart again," "Think about why your ex left," and "Agree with the breakup").

The police seized a laptop computer found in De Orenday's living room. A forensic analysis showed that De Orenday had repeatedly visited multiple dating websites during the time period between March 11, 2013 to August 26, 2013. De Orenday had also entered search queries related to Facebook hacking, Popeye's restaurant locations, "How to get someone fired," "cheaters," "conditions to commit a loved one to get mental help," and Anthony Lewis.

Prior Acts

The People also presented evidence at trial that De Orenday had previously stalked and used physical violence against women with whom he had a relationship: Nelly Ulate-Briles and Linda Hager.

Ulate-Briles, the mother of De Orenday's first three children, was married to De Orenday for eight years before divorcing him in 2002. When she was five or six months pregnant with Michael, Ulate-Briles attempted to leave the apartment she shared with De Orenday, and De Orenday physically prevented her from leaving by standing in the doorway, causing her to retreat into a bedroom closet where she "felt safe." In 1995, when she was seven months pregnant with David, De Orenday became angry with her, threw her on the bed, straddled her, and choked her with both hands so hard that she was

10

having difficulty breathing for about 30 seconds until she was able to push him off to her right side, after which De Orenday kicked her off the bed and she ran away. On another occasion while she was pregnant with David, De Orenday, driving a car with Ulate-Briles riding in the passenger seat, reached over, grabbed the back of her head, and smashed her head several times into the side frame of the car. Near the end of their marriage, De Orenday threatened her that he would take their children and kill her.

After Ulate-Briles filed for divorce in 2000, De Orenday stalked her, going to her mother's house (where she lived at the time), her work, and her school where she was taking classes. After Ulate-Briles moved into her own house after staying with her mother temporarily, De Orenday blocked her car by parking behind it in the driveway, broke into the house through a bedroom window, "came at" her with a blank expression, and grabbed and pushed her up against the kitchen stove, causing her to dial 911 and report her location, after which, De Orenday released her and fled.

Hager moved in with De Orenday in summer 2002. About three months after she moved in with him, she and De Orenday got in an argument during a trip to Texas. She returned to San Diego separately from De Orenday. After arriving home, she discovered that De Orenday had locked her out. When she banged on the door for him to let her in, De Orenday opened the door, reached out, grabbed her around the neck with both hands, and choked her for about 10 seconds before Hager, begging to be let go, wrenched herself free.

11

Defense

De Orenday testified at trial. He claimed the handwritten notes found on his dining table detailing the different degrees of homicide were merely notes from a paralegal class he took three years earlier. With respect to the night of September 21, 2013, De Orenday claimed that, after he and Mirella walked away from Mirella's apartment, they got into the back seat of his truck and started talking. Mirella initially denied being in a relationship with Shaw, but later admitted that Shaw had proposed to her. She then added, "I told you, I told you," "I'm horny. Hot." De Orenday "became numb" and "reached out." He testified, "I'm looking and I'm looking at my hands as I'm holding her neck. I just remember soft—thinking it's soft but just seeing—seeing me do this." Mirella "quickly slumped down," and the next thing De Orenday could remember, he was on top of her, "making lines on her neck" with the box cutter. Mirella grabbed at the box cutter, and De Orenday, holding the cutter with one hand, choked Mirella to death slowly with the other. He drove around for some time then went to his apartment before deciding to kill himself. He cut his arms with the box cutter. He went to Walmart and bought syringes and turkey basters to try to drain his carotid artery, and when that did not work, he bought a hose, affixed it to his truck exhaust, and ran it into the cab of the truck. His efforts to kill himself were unsuccessful, so he decided to go to the police station. De Orenday claimed that when he went to Mirella's apartment the evening of September 21, 2013, he was not intending to hurt her and was not thinking of killing her.

## DISCUSSION

De Orenday claims the trial court prejudicially erred in admitting evidence of his prior uncharged bad acts under Evidence Code[1] sections 1109 and 1101, subdivision (b). We disagree.

### A. Background

The prosecutor filed a motion in limine seeking admission of evidence of De Orenday's prior acts of domestic violence against Ulate-Briles and Hager. The prosecutor offered two theories of the proposed evidence's admissibility. One, the prosecutor contended that the prior bad acts were admissible under section 1109 as propensity evidence. Two, the prosecutor asserted that the proposed evidence was admissible to show motive and intent under section 1101, subdivision (b).

The court noted that the evidence concerned acts that occurred more than 10 years prior. As such, the court correctly noted that the evidence could only be admitted in "the interest of justice." The court found that the instant matter involved domestic violence because De Orenday was charged with the murder of his wife. It further determined that the prior acts concerned domestic violence and then evaluated whether the evidence was more probative than prejudicial. Ultimately, the trial court concluded, "I think it's more probative than prejudicial and because of the similarities of the priors to the pending case, I think it is in the interest of justice to allow the evidence."

---

1    Statutory references are to the Evidence Code unless otherwise specified.

De Orenday, who was preceding in propria persona at the time, objected, arguing that there has "never been any domestic violence" and claimed that he was a victim of domestic violence. The court informed him that he would be given the opportunity to cross-examine the witnesses and challenge their version of events. Accordingly, the court ruled that the proposed evidence was admissible under section 1109.

However, the court found that the prior acts evidence involving Hager was not admissible to prove motive and intent under section 1101, subdivision (b). It did allow the admission of the prior bad acts involving Ulate-Briles under that subdivision.

B. The Law

In *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233 (*Brown*), the court provided an overview of the law governing the admissibility of uncharged acts of domestic violence under section 1109.

> " 'Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.) However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109).' [Citation.] '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' " (*Brown, supra,* 192 Cal.App.4th at pp. 1222-1223.)

Section 1109, subdivision (a)(1) provides in relevant part:

> "Except as provided in subdivision (e) . . . in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic

14

violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[2]

The exception contained in subdivision (e) provides:

> "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (§ 1109, subd. (e).)

In *People v. Johnson* (2010) 185 Cal.App.4th 520 (*Johnson*), the court considered the meaning of the "interest of justice" exception contained in section 1109, subdivision (e). The court stated that "[s]ubdivision (e) establishes a presumption that conduct more than 10 years prior to the current offense is inadmissible." (*Johnson, supra,* at p. 539.) In addition, the court concluded "that a more stringent standard of admissibility applies." (*Ibid.*) In reaching this conclusion, the court reasoned in part:

> "[S]ome greater justification for admissibility is necessary under subdivision (e) than under section 352. Balancing under section 352 is required even under subdivision (a), where the presumption runs in favor of admission. By including a specific 'interest of justice' requirement under subdivision (e), the Legislature must have intended to require a more rigorous standard of admissibility for remote priors." (*Johnson*, *supra*, at p. 539.)

In describing the nature of this more rigorous standard for admission of evidence of remote acts of domestic violence, the court noted that under section 352, "evidence may be excluded only where its probative value is 'substantially outweighed' by its prejudicial effect." (*Johnson*, *supra,* 185 Cal.App.4th at p. 539.) In contrast, under

---

2    Section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

15

section 1109, subdivision (e), the court reasoned, "the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales." (*Johnson, supra,* at p. 539.) The court ultimately concluded, "[T]he 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*Johnson*, *supra*, at pp. 539-540.) Thus, although under section 352 there is a presumption in favor of admissibility that may be overcome only by potential prejudice that substantially outweighs the probative value of the evidence, under section 1109, subdivision (e), there is a presumption against admissibility that may be overcome only where the probative value of the evidence outweighs the potential for prejudice.

We review a trial court's "interest of justice" determination under section 1109, subdivision (e) for an abuse of discretion. (See *Johnson*, *supra*, 185 Cal.App.4th at p. 539.) On the record before us, we are satisfied that the trial court did not abuse its discretion in finding the evidence admissible in the interest of justice.

Initially, we observe the court applied the correct standard of admissibility in regard to the prior acts remote in time. The court evaluated whether the evidence was more probative than prejudicial. (*Johnson*, *supra*, 185 Cal.App.4th at pp. 539-540.) Moreover, the trial court specifically referenced the factors set forth in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) for determining the admissibility of propensity

evidence.[3]  Those factors include (1) the nature, relevance, and remoteness of the acts; (2) the similarity of the acts to the charged offense; (3) the degree of certainty that the defendant had in fact committed the prior acts; (4) the likelihood of such evidence confusing, misleading, or distracting the jury; (5) the likely prejudicial impact of the evidence; (6) the burden on the defendant in defending against those acts; and (6) the availability of less prejudicial alternatives.  (*Id*. at p. 917.)

In the instant matter, the prosecutor's theory was that De Orenday was upset because Mirella ended their relationship, he thought about killing her, and ultimately, choked her to death.  The prior acts evidence at issue showed similar behavior from De Orenday in the past.  For example, De Orenday's ex-wife Ulate-Briles filed for a divorce from him, and he engaged in a pattern of stalking and harassment against her and threatened to kill her.  The prior bad acts evidence also showed that De Orenday would resort to physical violence against women with whom he was in a romantic relationship. He physically prevented Ulate-Briles from leaving on one occasion, causing her to retreat into a closet for safety.  He bashed her head against the side frame of the car in which they were riding.  And, much like what he did to the victim here, De Orenday choked both Ulate-Briles and Hager with his bare hands after arguing with them.  De Orenday

---

3      In *Falsetta*, our high court provided certain factors to be considered in determining the admissibility of sexual propensity evidence under section 1108.  (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.)  The California Courts of Appeal have subsequently applied *Falsetta* and its rationale to determine the admissibility of domestic violence propensity evidence under section 1109.  (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1334; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313-1316 (*Jennings*).)  We do the same thing here.

therefore had two prior incidents of choking his significant other in anger. Also, Ulate-Briles and Hager both testified that, when De Orenday choked them, he did not release either one of them. Instead, Ulate-Briles forcibly bucked him off and Hager wrenched herself away after begging for De Orenday to let her go. The prior acts evidence was thus similar to and highly relevant to prove the acts for which De Orenday was charged.

Nevertheless, De Orenday insists the prior incidents were too dissimilar for admission because, in Ulate-Briles's case, she "did not have a boyfriend prior to divorcing [him] that incited anger in him," and in Hager's case, because they "were not married, they had no children together and were together no more than three months prior to the choking incident." These proposed distinctions are unavailing. De Orenday ignores the obvious similarities between the prior bad acts and the charged crime here.

As he did with Mirella, De Orenday stalked and harassed Ulate-Briles when she terminated their relationship. Further, the prior acts evidence shows De Orenday had a distinct proclivity of exerting physical violence upon his significant others, especially by choking them. In fact, Mirella was the third victim De Orenday forcibly choked. We simply cannot ignore such plain similarities. (*Johnson*, *supra*, 185 Cal.App.4th at pp. 532-533 [affirming trial court's admission at defendant's murder trial two remote prior acts in which the defendant shot a girlfriend; all the acts hinged on a "common factor" of defendant's inability to deal with anger with regard to female intimate partners, particularly those who "rejected or challenged" him].)

18

In addition, the victims of the prior acts both testified at trial. Thus, De Orenday was able to cross-examine them to challenge their version of events. Put differently, we agree with the trial court that there was a substantial certainty that De Orenday had actually committed the prior bad acts. Further, at trial, De Orenday admitted that he had choked Ulate-Briles until she bucked him off her, after which he kicked her off the bed, and that he had broken into Ulate-Briles's house after she separated from him, prompting her to call the police. With respect to his smashing Ulate-Briles's head against the interior car frame and choking Hager, De Orenday did not deny committing those acts, but testified only that he could not recall them.

We also reject De Orenday's assertion that the prior bad acts were too remote. There are no specific time limits establishing when a prior offense is so remote as to be inadmissible. (*People v. Pierce* (2002) 104 Cal.App.4th 893, 900.) Here, the bad acts occurred between 12 and 18 years before trial, which is not per se remote. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284 [evidence of 30-year-old sex offense properly admitted].) Moreover, we conclude that the similarities between De Orenday's attacks on Ulate-Briles and Hager described above balance out any remoteness. (Accord, *Pierce*, *supra*, at p. 900; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395.)

Also, the probative value of the prior bad acts evidence clearly outweighed any prejudice to De Orenday. The evidence bore minimal risk of confusing or misleading the jury, as the "past acts of violence were separated by time and involved different victims and witnesses." (*Johnson*, *supra*, 185 Cal.App.4th at p. 533.) The time spent on the testimony was minimal, spanning only 22 pages out of a trial transcript totaling 854

19

pages.  (*Johnson*, *supra*, 185 Cal.App.4th at p. 533 [47 pages]; *People v. Popla*r (1990) 70 Cal.App.4th 1129, 1139 [35 pages].)  The prior acts, while reprehensible, were less egregious than the act for which De Orenday was on trial.  (*Jennings, supra,* 81 Cal.App.4th at p. 1315 [affirming prior acts admission under section 1109 where, inter alia, the prior acts were "no more egregious than the charged offense"].) Finally, as we describe above, the evidence of De Orenday's guilt of first degree murder was strong. (*Johnson*, *supra*, at p. 536 [noting that the prejudicial effect of prior acts evidence is diminished where the evidence of the current crime is strong because it is "less likely the jury will be swayed to convict the defendant based on his past misconduct"].)  In short, the court did not abuse its discretion in admitting the prior bad acts evidence under section 1109.

Although De Orenday is not entitled to separate consideration of his claim that the trial court erred in admitting the prior bad acts in violation of section 1101 (see *Jennings*, *supra*, 81 Cal.App.4th, at p. 1316), even if we were to address that claim, we would find it lacks merit.

Similar to his challenge under section 1109, De Orenday contends the prior bad act evidence is too prejudicial to be admitted under section 1101.  To this end, De Orenday maintains the instant matter is analogous to *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*).  It is not.

In *Harris*, the trial court prejudicially abused its discretion in admitting an incomplete and distorted version of the defendant's prior act involving brutal sexual mutilation in a case in which the defendant had kissed, fondled and sexually preyed upon

20

emotionally and physically vulnerable women, crimes held to be of a "significantly different nature and quality." (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) Here, the prior bad acts and the charged crimes were sufficiently similar. They both involved De Orenday stalking, threatening, physically abusing, and choking a former romantic partner who had ended their relationship. *Harris* is not instructive.

In summary, De Orenday has not shown that the court abused its discretion in admitting the prior bad acts involving Ulate-Briles under section 1101. The court properly exercised its discretion. Nothing in the record leads us to conclude the court's decision was arbitrary, capricious, or patently absurd that resulted in a miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Nor is there anything in the record indicating the trial court's ruling fell outside the bounds of reason. (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

DISPOSITION

The judgment is affirmed.

_____<br>HUFFMAN, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
O'ROURKE, J.

21