Filed 7/26/24  P. v. Kingston CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SEAN PATRICK KINGSTON,<br><br>    Defendant and Appellant. | D084019<br><br><br><br>(Super. Ct. No. INF2001771) |

APPEAL from a judgment of the Superior Court of Riverside County, Magdalena Cohen, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Sean Patrick Kingston appeals from a judgment after his jury conviction of inflicting corporal injury resulting in a traumatic injury against Jane Doe, a person with whom he had a dating relationship (count 1)

1

(Pen. Code, § 273.5, subd. (a)) and forcibly raping Doe (count 2) (Pen. Code, § 261, subd. (a)(2)). The jury also found true the allegation that in committing count 1, Kingston caused Doe great bodily injury (Pen. Code, §§ 12022.7, subd. (e), 1192.7, subd. (c)(8)).

On appeal, Kingston contends that the trial court abused its discretion under Evidence Code[1] section 352 by admitting evidence of his prior act of domestic violence pursuant to section 1109. The People argue that Kingston forfeited any challenge to the admission of that evidence by not objecting below and, in any event, the court did not abuse its discretion by admitting it. As we explain below, we agree with the People and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2020, Doe and Kingston met in Corona and developed a romantic relationship. Doe knew that Kingston was homeless and a methamphetamine addict, but she wanted to help him get clean.

On October 17, 2020, while Doe and Kingston were living in San Diego, Doe was sitting in the backseat of her car texting a male friend. Kingston took her phone from her, saw who she was texting, and became enraged. He hit her on her left hip and leg, grabbed her by her hair, and pulled her out of the car. When Doe tried to resist, Kingston grabbed her wrist and then she "went limp and tried to scare him into stopping," by faking a seizure. Kingston called an ambulance and she was taken to a hospital.

Doe sustained a broken wrist and bruises on her leg and below her hip area. After initially telling a nurse she had been injured by accident, she eventually admitted that Kingston had caused her injuries. Kingston was arrested for domestic violence.

---

[1] All further statutory references are to the Evidence Code unless otherwise specified.

After his arrest, Doe relented to Kingston's requests that she pay his bail and he was released from jail. Afterward, Kingston was very apologetic, loving, and caring. Doe continued her relationship with him to appease him and prevent him from hurting her or her family.

On October 26, Doe and Kingston drove to Palm Desert to stay temporarily at her friend's vacation home. Doe was still recovering from her injuries and could not walk very far. A couple of days later, they began arguing about money and agreed to sell a used speaker for cash to buy groceries and gas. On October 29, Kingston went to visit his daughter in Corona, taking the speaker with him. He did not have it when he returned.

On October 31, Kingston drove away in Doe's car, telling her that he was going to celebrate Halloween with his daughter. While he was gone, he began sending Doe angry texts, demanding that she send him gas money. He also accused her of cheating on him and told her she would "have to pay for that" when he got back. On his return about midnight, Kingston was angry, took Doe's phone, and hid her car keys. Doe told him they did not have any money and that he needed to stop taking her money. Kingston became more enraged when he looked at her phone and found a text from a male friend. Cursing her, Kingston pushed Doe to the ground in the laundry room and wrapped his arms and legs around her in a "bear hold." He wrapped his arm around her neck in a choke hold. He placed his hand over her mouth to stop her screaming and told her, "I'm going to kill you." He hit her repeatedly on her left leg, which was already injured. After about three to five minutes, he stopped, stood up, and dragged her by her hair through the dining room and into the bedroom. In the process, hair was ripped from her head.

In the bedroom, Kingston threw Doe onto the bed face up and pinned her down with his knees. He then flipped her over face down and pinned her

3

with his body weight.  He then penetrated her vagina with his penis several times.  As he did so, Doe yelled, "Please stop.  I don't want to.  Please stop.  It hurts, stop."  Kingston then flipped Doe over again and pinned her down, tying her hands together with a zip tie.  Although she was able to break free of the zip tie, Kingston sat on top of her, holding a hammer, and asked her, "If I hit you hard enough, do you think it will kill you[?]"  He showed her some rope on the night stand and threatened to tie her up and have men come to rape her while he watched.

Kingston then went into the kitchen for 10 minutes and returned to attack Doe again.  As she fought back and screamed, he again threatened to have other men rape her and covered her mouth with both of his hands.  He also told her he was going to kill her daughter and granddaughter, referring to them by their names.  As he continued to press down on her mouth, Doe lost consciousness.  When she awoke, Kingston was splashing water on her. He hit her temples with the palms of his hands.  He then turned her face down and raped her again.  She pleaded with him to stop.  He eventually stopped and told her, "I'm sorry, but I'm not sorry."

When Doe needed to use the bathroom, Kingston carried her there because she was in too much pain and then he carried her to the couch in the living room.  He gave her whiskey and pills to take, telling her it would make her feel better.  After sitting beside her for about 30 minutes, Kingston went downstairs to the garage.  Being in too much pain, Doe was unable to get up and walk around.  At that point, it was November 1.

Kingston returned and attacked her a third time, flipping her over face down and attempting to penetrate her anally.  When she cried and begged him to stop, he penetrated her vagina with his penis.  She repeatedly asked him to stop and stated he was hurting her.  After a few minutes, he stopped,

4

went to the kitchen to get a drink, and brought a drink for Doe. Doe remained on the couch most of that day and Kingston helped her when she needed to use the bathroom. At about 3:00 p.m., Kingston told Doe that he was going to get food and went down to the garage. She went to the exterior stairs to look whether he had left. He had not left, threw his wallet at Doe, and told her to go back into the house. Doe saw neighbors across the street, who said something to her, but she did not ask them for help. She was afraid that Kingston would kill her or hurt her family. She returned to the couch. Kingston still had Doe's car keys and cell phone and drove away in her car. He returned one and one-half hours later. He gave her some food, which she could barely eat because of her bloodied and swollen lips. He then gave her more pills and alcohol.

During the following night, Kingston attacked Doe again, climbing on top of her and placing his hands over her mouth and nose. He told her that if she called the police, he would say that she caused her injuries herself. She lost consciousness again. When she awoke, he carried her to the couch and gave her more alcohol and pills. She eventually fell asleep on the floor, but later awakened and walked to the bedroom. She saw Kingston was face down in the bed, apparently sleeping. When she made noise to see if he would wake up, he continued to sleep. She then searched for her phone and found it between the mattress and box spring. She then called a friend who is a police officer.

Doe left the home, walked to a tree near a neighboring house, and left her phone there because she was afraid it would ring or Kingston would come looking for it. She then went next door and asked a neighbor, J.L., for help. Crying and distraught, Doe told J.L., "He's going to kill me" and "He's asleep

5

and he will wake up if we make too much noise." J.L. invited Doe inside her home, locked the doors, and called 911.

A Riverside County Sheriff's Department investigator arrived shortly thereafter and contacted Doe at J.L.'s home. Doe had bruises under her eye and on other parts of her body. Her lips were chapped and there was dried blood under her lips. Crying and visibly afraid, Doe told the investigator that any responders had to be quiet and she was worried Kingston would awaken. Doe told the investigator that there had been a domestic violence incident with Kingston. Doe was transported to a hospital, while deputies went to contact Kingston. They used a loudspeaker to speak to Kingston. After 10 to 15 minutes, he walked out onto the balcony, but refused commands to place his hands on his head and instead ran back into the home. Deputies entered the home and took Kingston into custody. He requested medical attention and was taken to the hospital.

At the hospital, Kingston denied any domestic violence and claimed that Doe fell because of a seizure, which fall had caused her injuries. He denied ever hitting Doe.

During a sexual assault and strangulation examination of Doe, a nurse observed bruising on Doe's arms, legs, and face, which bruising was consistent with Doe's descriptions of the incident. Doe also had multiple abrasions, including one above her lip. She was limping and complained of pain in her leg, knee, face, neck, and arms. She also reported dizziness, a headache, a sore throat, and urination, which symptoms were consistent with strangulation. Kingston's DNA was found in Doe's vagina, anal area, and around her mouth.

After her examination, Doe told the investigator about the San Diego incident and the Palm Desert incident. Doe denied having grand mal

6

seizures or telling Kingston that she had them, and she had told him only that her arm would seize up if she did not take her medication. She said she could tell Kingston was using methamphetamine before the Palm Desert incident based on his behavior. Doe asked the investigator to obtain an emergency restraining order to prevent Kingston from contacting her family.

Searching the Palm Desert home, deputies found drops of blood on a pillow and on the floor in and near the laundry room. There was a roll of duct tape in the bed.

An information charged Kingston with three counts: (1) inflicting corporal injury resulting in a traumatic injury against Doe, a person with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a)); (2) forcibly raping Doe (Pen. Code, § 261, subd. (a)(2)); and (3) falsely imprisoning Doe (Pen. Code, § 236). The information also alleged that in committing count 1, Kingston personally inflicted great bodily injury on Doe (Pen. Code, §§ 12022.7, subd. (e), 1192.7, subd. (c)(8)).

At trial, the prosecution presented evidence substantially as described above. In his defense, Kingston presented evidence to show that Doe was a liar and that her injuries were caused either by his holding her down for her own protection during a seizure or by her falling or running into things because she was drunk. He also presented the testimony of J.B., a neighbor who saw Doe on the stairs when Kingston threw his wallet at her. When J.B. asked Doe if she was okay, Doe said, "Yes." Kingston also presented evidence regarding a June 2020 incident when he and Doe went to a fire station and told a paramedic that Doe had two seizures that morning. Doe stated her seizures were caused by alcohol withdrawal and she had no prior history of seizures.

7

The jury found Kingston guilty of counts 1 and 2 and not guilty of count 3. The jury also found true the great bodily injury allegation related to count 1. The court sentenced Kingston to the middle term of six years for count 2 and a concurrent low term of two years for count 1 with a three-year enhancement for the related great bodily injury allegation, for a total term of six years in prison. Kingston filed a notice of appeal challenging the judgment.

DISCUSSION

I

*Forfeiture of Challenge to Admission of Section 1109 Evidence*

Kingston contends that the trial court abused its discretion under section 352 by admitting evidence of the San Diego incident as a prior act of domestic violence pursuant to section 1109. In so contending, he asserts that he sufficiently objected to its admission. The People disagree and argue that he did not object below and therefore forfeited his challenge to admission of that evidence.

A

In general, character evidence is not admissible to prove a person's conduct on a specified occasion. (§ 1101, subd. (a).) However, section 1109 provides an exception to that general rule in cases in which a defendant is accused of domestic violence. (§ 1109, subd. (a).) Section 1109, subdivision (a) provides: "[E]vidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Under section 352, a trial court has discretion to exclude evidence if its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

8

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In exercising its discretion to exclude propensity evidence under section 352, a trial court should consider factors, such as: (1) the nature, relevance, and possible remoteness of the prior offense; (2) the degree of certainty of its commission; (3) the possibility of misleading or distracting the jury from its main inquiry or of confusing the jury, such as leading the jury to punish the defendant for previous uncharged behavior; (4) its similarity to the charged offense; (5) the burden on the defendant to defend against the prior uncharged act; (6) the likelihood of prejudice; (7) the availability of less prejudicial alternatives to its admission; and (8) whether its admission would create an undue consumption of time. (*People v. Loy* (2011) 52 Cal.4th 46, 61; *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

On appeal, we review a trial court's decision to admit evidence of prior domestic violence under section 1109 for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).) If such evidence was erroneously admitted and made the trial fundamentally unfair, the defendant's right to due process has been violated and the judgment must be reversed. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Absent a fundamentally unfair trial, the erroneous admission of section 1109 evidence is not reversible error unless it is reasonably probable that the verdict would have been more favorable to the defendant absent the error. (*Ibid.*; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

If a defendant does not timely and specifically object to the admission of evidence, the defendant forfeits any contention on appeal that the evidence was erroneously admitted. (§ 353, subd. (a) [judgment shall not be reversed based on erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely

9

made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Anderson* (2001) 25 Cal.4th 543, 586 (*Anderson*).)

B

Before trial, the prosecution submitted a trial brief that included, among other things, a motion in limine to admit evidence of the San Diego incident pursuant to section 1109. Kingston submitted a motion in limine seeking to exclude evidence of his prior acts of domestic violence that occurred in 2009 and 2017, but did *not* seek to exclude, and did not otherwise object to admission of, evidence of the San Diego incident that occurred on October 17, 2020.

At the hearing on the parties' in limine motions, the trial court addressed the section 1109 evidence relating to the San Diego incident, stating:

> "[Section] 1109 was addressed in both the People and the defense brief. The People's brief asserts one prior incident from 2020 in San Diego. That appeared to be the same complaining witness; is that accurate?"

The prosecutor replied:

> "Correct, Your Honor. I know [defense counsel's] brief talks about . . . there [were] two prior [section] 1109 victims [presumably referring to the 2009 and 2017 incidents]. We have not been able to locate them and secure their presence at this point. They were on the People's witness list, but I have not been able to secure their presence."

The court then stated: "My tentative would be to allow that one 2020 incident. I think under the analysis of [section] 1109, and really even before that of [section] 1101, with the same complaining witness, it's relevant evidence that propensity is allowed and contemplated by [section] 1109." The court then asked: "Does anyone want to be heard further?" Kingston's counsel replied, "No, Your Honor." The court then excluded only the evidence

10

of Kingston's prior domestic violence involving other victims in 2009 and 2017.

At trial, the prosecution presented, without any objection by Kingston, the evidence described above regarding the San Diego incident on October 17, 2020.

C

The People argue that Kingston forfeited his challenge on appeal to the admission of the San Diego incident as evidence of a prior act of domestic violence pursuant to section 1109 by not timely and specifically objecting to that evidence. We agree.

At the pretrial hearing on the parties' in limine motions, Kingston only sought exclusion of section 1109 evidence regarding incidents in 2009 and 2017, both of which involved other victims. In so doing, he did not object to admission of the San Diego incident, which occurred on October 17, 2020, involving Doe. Furthermore, although the prosecution filed an in limine motion seeking admission of evidence of the San Diego incident pursuant to section 1109, Kingston neither filed any written response to that in limine motion nor voiced any objection to admission of that evidence at the pretrial hearing on the in limine motions. As discussed above, immediately after the trial court indicated that its tentative position was to admit evidence of the San Diego incident pursuant to section 1109, the court asked: "Does anyone want to be heard further?" Kingston's counsel replied, "No, Your Honor." The court thereafter excluded only the section 1109 evidence of Kingston's prior domestic violence involving other victims in 2009 and 2017. Also, when the prosecutor offered evidence of the San Diego incident at trial, Kingston did not object.

The record on appeal clearly shows that Kingston did *not* object, much less timely and specifically object, to the prosecution's section 1109 evidence of the San Diego incident involving Doe. As the People argue, by failing to so object, Kingston forfeited any challenge on appeal to the admission of that evidence at trial. (§ 353, subd. (a); *Anderson, supra,* 25 Cal.4th at p. 586.)

Contrary to his conclusory assertion, Kingston did *not* object to the admission of the section 1109 evidence of the San Diego incident. In support of his assertion, he does not cite to any specific language in the record on appeal showing that he timely and specifically objected to that evidence. At most, he asserts in his appellant's reply brief: "At the hearing the court evincing knowledge that the defense would like it excluded noted that its tentative was to allow the San Diego incident, with the same victim as relevant propensity evidence and asked both counsel if anyone wanted to [be] heard further on any of the issues and no one had anything to add." However, there is nothing in the reporter's transcript for that pretrial hearing that supports his assertion that the court "evince[ed] knowledge" that Kingston would like the San Diego evidence excluded. Rather, at that hearing, Kingston's counsel remained silent during the discussion of the evidence of the San Diego incident. Importantly, when the court asked Kingston's counsel and the prosecutor whether they wanted to be heard further regarding its tentative ruling to admit that evidence, Kingston's counsel, replied, "No, Your Honor." If Kingston intended to object to admission of the evidence of the San Diego incident pursuant to section 1109, it was incumbent on him to expressly object to its admission either at the pretrial hearing or subsequently during trial. By not so doing, Kingston forfeited any challenge on appeal to its admission. (§ 353, subd. (a); *Anderson, supra,* 25 Cal.4th at p. 586.) Therefore, we need not address the

12

merits of his contention that the court abused its discretion by admitting that evidence.

## II

### *Admission of Section 1109 Evidence*

Nevertheless, assuming arguendo that Kingston did not forfeit his challenge on appeal to admission of evidence of the San Diego incident pursuant to section 1109, we conclude the trial court did not abuse its discretion under section 352 by admitting that evidence. Rather, in weighing the section 352 factors, the court could rationally conclude that the probative value of the evidence of the San Diego incident was not substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352.)

First, as the People argue, the trial court could rationally conclude that evidence of the San Diego incident was highly probative of Kingston's propensity to commit domestic violence against Doe. That incident occurred just two weeks before the charged offenses and involved the same victim. Also, both incidents appeared to have been prompted by Kingston's anger regarding Doe's texts to other men and involved similar violent acts (e.g., hitting her hip and leg and grabbing her hair). (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 [closeness in time and similarity of incidents increases probative value of prior acts to show propensity].) Furthermore, the court could rationally conclude that the fact that Doe suffered a broken wrist during the San Diego incident was probative regarding Kingston's propensity to inflict great bodily injury on Doe. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027.)

13

Second, as the People argue, the court could rationally conclude that the risks of undue prejudice from evidence of the San Diego incident were minimal and did not outweigh its substantial probative value. Contrary to Kingston's assertion, there was little, if any, possibility that the jury would confuse the San Diego incident, which occurred on October 17, 2020, with the instant Palm Desert incident, which occurred two weeks later. As described in detail above, the locations, events, lengths, and circumstances of the two incidents were different, making it unlikely the jury could confuse them. In particular, the San Diego incident was a brief violent attack in and near a car, whereas the Palm Desert incident was a prolonged attack over three days inside their temporary home. Contrary to Kingston's assertion, it was unlikely that the jury would confuse the San Diego incident with the Palm Desert incident because evidence was admitted showing that Doe suffered a broken wrist and other injuries during the San Diego incident. Importantly, the prosecution presented much more evidence regarding the injuries Doe suffered from the Palm Desert incident than it did regarding the injuries she suffered from the San Diego incident. Furthermore, in closing arguments, the prosecutor did not mention Doe's broken wrist in arguing that Kingston committed great bodily injury during the Palm Desert incident. Rather, the prosecutor referred to the bruising Doe suffered to her lips, face, arms, and legs, the abrasion to her lips, and the pain in her leg. (Cf. *Johnson*, *supra*, 185 Cal.App.4th at p. 533.) Importantly, we also note that the trial court instructed the jury with CALCRIM No. 852A regarding evidence of uncharged domestic violence and, in particular, regarding the San Diego incident. That instruction informed the jury that evidence of Kingston's domestic violence during the San Diego incident was not charged in the instant case and included a limiting instruction regarding the jury's

14

consideration of that evidence.[2]  That instruction minimized, if not eliminated, any possible confusion by the jury between the evidence, charges, and allegations arising out of the instant Palm Desert incident and the evidence of Kingston's uncharged domestic violence during the prior San Diego incident.  Based on our review of the record, we conclude that it is unlikely the jury was confused that it was deciding Kingston's guilt for the San Diego incident instead of his guilt for domestic violence, rape, and false imprisonment, or the truth of the related great bodily injury allegation, arising out of the Palm Desert incident.  (*People v. Kerley* (2018) 23 Cal.App.5th 513, 539.)

Furthermore, the court could rationally conclude that it was unlikely the jury would convict Kingston for the prior San Diego incident instead of the Palm Desert incident in the belief that he escaped punishment for that prior incident.  In particular, because there was no evidence admitted at trial showing whether or not any charges were filed against Kingston for the San Diego incident, the jury could not reasonably infer that he had avoided prosecution for his actions during the San Diego incident.  To the contrary, there was evidence showing that at the time of the instant trial, there was an

---

[2]  That instruction stated in relevant part: "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit inflicting corporal injury resulting in traumatic condition, rape or false imprisonment, as charged here.  If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of inflicting corporal injury resulting in traumatic condition, rape or false imprisonment.  The People must still prove each charge and allegation beyond a reasonable doubt."

active investigation by San Diego law enforcement regarding Kingston's actions during the San Diego incident.

To the extent Kingston argues evidence regarding his actions during the San Diego incident was too uncertain to constitute admissible section 1109 evidence of his propensity to commit domestic violence, we conclude that the evidence discussed above was sufficiently specific and certain to support its admission under section 1109. Furthermore, the jury needed to find Kingston committed that prior domestic violence by only a preponderance of the evidence, which burden of proof supported its admission by the court. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

Also, contrary to Kingston's assertion, the trial court could rationally conclude that evidence of the San Diego incident was not likely to evoke an emotional bias against him. Our review of the evidence of the two incidents supports a rational conclusion by the court that Kingston's actions during the San Diego incident were far less inflammatory or egregious than his actions during the Palm Desert incident for which he was on trial. In particular, the instant Palm Desert incident transpired over an extended three-day period and involved multiple attacks, multiple rapes, multiple threats of violence, and multiple suffocations resulting in Doe's loss of consciousness. Accordingly, the court could rationally conclude that, in comparison, the evidence of the Palm Desert incident was much more egregious than the prior San Diego incident.

Finally, contrary to Kingston's assertion, the court could rationally conclude that the admission of evidence of the San Diego incident would not require an undue consumption of time. At trial, as described above, the prosecution presented only Doe's trial testimony and her statements to law enforcement to prove Kingston's prior domestic violence during the San Diego

16

incident. That evidence consumed only a short amount of time during the trial in comparison to the time involved in the prosecution's presentation of the voluminous evidence regarding the instant Palm Desert incident. Furthermore, in his defense, Kingston presented the testimony of a police officer and investigator who had interviewed Doe regarding the San Diego incident, thereby consuming additional trial time himself. Also, in closing, Kingston's counsel, among other things, used additional trial time in arguing that Doe's statements regarding the San Diego incident were inconsistent in attempting to discredit her testimony regarding the Palm Desert incident and otherwise and to offer possible alternative explanations for his actions or inactions.

Accordingly, considering the record as a whole, we conclude that the trial court did not abuse its discretion under section 352 by admitting evidence of the San Diego incident under section 1109 to show Kingston's propensity to commit domestic violence. To the extent Kingston argues otherwise, he misconstrues and/or misapplies the applicable standard of review.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

RUBIN, J.